## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DAVID C. FANNIN AND LUCILLE S.
FANNIN AS CO-TRUSTEES OF THE DAVID
C. FANNIN REVOCABLE TRUST DATED
AUGUST 3, 1995 AND THE LUCILLE
STEWART FANNIN REVOCABLE TRUST
DATED AUGUST 3, 1995,

            Plaintiffs,

        v.

UMTH LAND DEVELOPMENT, L.P., UMT
SERVICES, INC., UMT HOLDINGS, L.P.,
UMTH GENERAL SERVICES, L.P., UNITED
MORTGAGE TRUST, UNITED
DEVELOPMENT FUNDING, L.P., UNITED
DEVELOPMENT FUNDING IV, UNITED
DEVELOPMENT FUNDING X, L.P., TODD F.
ETTER, HOLLIS M. GREENLAW, MICHAEL
K. WILSON, BEN L. WISSINK, CARA D.
OBERT, AND MELISSA H. YOUNGBLOOD,

            Defendants,

    and

UNITED DEVELOPMENT FUNDING III, L.P.,

        Nominal Defendant.

) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )

C.A. No. 12541-VCF

## MEMORANDUM OPINION

Date Submitted: April 14, 2020
Date Decided: July 31, 2020

Robert J. Kriner, Jr. and Tiffany J. Cramer, CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP, Wilmington, Delaware; *Attorneys for Plaintiffs David C. Fannin and Lucille S. Fannin as Co-Trustees of the David C. Fannin Revocable Trust Dated August 3, 1995 and the Lucille Stewart Fannin Revocable Trust Dated August 3, 1995*.

Steven L. Caponi, K&L GATES LLP, Wilmington, Delaware; John W. Rotunno, Paul J. Walsen, Joseph C. Wylie II, Molly K. McGinley, Matthew A. Alvis, K&L GATES LLP, Chicago, Illinois; *Attorneys for UMTH Land Development, L.P., UMT Services, Inc., UMT Holdings, L.P., UMTH General Services, L.P., United Mortgage Trust, United Development Funding, L.P., United Development Funding IV, and United Development Funding X, L.P.*

Myron T. Steele, Timothy R. Dudderar, Jacqueline A. Rogers, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Attorneys for Defendants Todd F. Etter, Hollis M. Greenlaw, Michael K. Wilson, Ben L. Wissink, Cara D. Obert, and Melissa Youngblood.*


**FIORAVANTI, Vice Chancellor**

United Development Funds is a family of investment funds that makes loans for the purpose of real estate development. The nominal defendant in this action, United Development Funding III, L.P. ("UDF III" or the "Partnership"), is a Delaware limited partnership and a member of the family. The plaintiffs are limited partners of UDF III. They allege that UDF III's general partner and the entities and individuals that ultimately control UDF III used the Partnership's funds to support earlier-formed funds within the family as part of a broader scheme to conceal the earlier funds' losses and to support their continued payment of partnership distributions. Plaintiffs allege the general partner and those that control it breached their fiduciary duties and UDF III's limited partnership agreement, committed corporate waste, and were unjustly enriched. Plaintiffs also allege that affiliates of the general partner aided and abetted the breaches of fiduciary duty alleged in the complaint and were also unjustly enriched.

The defendants have moved to dismiss for failure to plead demand futility, failure to state a claim, and laches. This opinion concludes that the motions to dismiss should be granted in part and denied in part. The plaintiffs have adequately pleaded demand futility, and they have stated claims for breach of fiduciary duty and breach of contract, unjust enrichment, and aiding and abetting a breach of fiduciary duty. The claim for waste of partnership assets is dismissed for failure to state a claim.

## I. FACTUAL BACKGROUND

The facts recited in this opinion come from the Verified Second Amended and Supplemental Derivative and Class Action Complaint (the "Complaint" or "SAC"), the exhibits attached thereto, and documents incorporated by reference into the Complaint.[1]

### A. The Parties

Plaintiffs own limited partnership units ("LP Units") in the Partnership.[2] Plaintiffs bring their complaint derivatively on behalf of UDF III and directly on behalf of themselves and the unaffiliated holders of the LP Units ("Limited Partners").

The eight entity defendants reside within the United Development Funds family: (a) four engage in real estate loans: United Mortgage Trust ("UMT"), United Development Funding, L.P. ("UDF I"), United Development Funding IV, L.P. ("UDF IV"), and United Development Funding X, L.P. ("UDF X"); (b) the Partnership's general partner, UMTH Land Development, L.P. ("UMTH LD" or the "General Partner");[3] (c) the General Partner's general partner, UMT Services,

---

[1] Dkt. 119.

[2] SAC ¶ 1. Plaintiffs purchased the LP Units for $250,000 in 2008 and have held the LP Units continuously since their purchase. *Id.* ¶ 25.

[3] UMTH LD is a Delaware limited partnership. *Id.* ¶ 29.

Inc. ("UMT Services");[4] (d) the 99.9% owner of the General Partner, UMT Holdings, L.P. ("UMT Holdings");[5] and (e) UMTH General Services, L.P. ("UMTH General"), which assists the General Partner in the management of the Partnership and provides external advisory services to UMT and UDF IV.[6] The foregoing entities are referred to as the "Entity Defendants."

The six individual defendants are alleged to "control and ultimately own" the General Partner: Todd F. Etter, Hollis M. Greenlaw, Michael K. Wilson, Ben L. Wissink, Cara D. Obert, and Melissa H. Youngblood (each an "Individual Defendant," and collectively, the "Individual Defendants").[7] The Individual Defendants indirectly own the General Partner through their collective 87.15% ownership of UMT Holdings.[8] In addition, Etter, Greenlaw, and Wilson comprise the board of directors of UMT Services, which is the general partner of the General Partner.[9]

---

[4] *Id.* ¶ 30. UMT Services is a Delaware corporation. *Id.*

[5] *Id.* UMT Holdings is a Delaware limited partnership. *Id.* ¶ 39.

[6] *Id.* ¶ 40. UMTH General is a Delaware limited partnership. *Id.* "UMTH General manages UMT's day-to-day operations, providing it with administrative services, and managing its assets." *Id.* ¶ 38.

[7] *Id.* ¶ 4.

[8] *Id.* ¶ 39.

[9] *Id.* ¶¶ 30, 31(b), 32(b), 33(a).

## B.     The United Development Funds

All of the Defendants are involved in raising investor funds for the purpose of making loans to fund real estate development.[10] UMT is a real estate investment trust formed in 1996 for the purpose of raising investor capital to invest in mortgage loans.[11] UMT is managed by an advisor controlled by Etter.[12]

In 2003, Etter and Greenlaw formed UMT Services, UMT Holdings, UMTH General, and UMTH LD.[13] UMT Services is the general partner of UMT Holdings, UMTH General, and UMTH LD.[14] In Plaintiffs' words, UMT Services is the entity "at the top of the Partnership's control structure."[15] UMTH LD is owned by UMT Holdings,[16] and UMT Holdings is in turn owned primarily by the Individual Defendants.[17]

---

[10] *See id.* ¶¶ 4, 28-44.

[11] *Id.* ¶ 45.

[12] *Id.*

[13] *Id.* ¶ 46.

[14] *Id.*

[15] Pls.' Ans. Br. 5, Dkt. 133; *see also* SAC ¶ 62 ("As the general partner of Land Development, Defendant UMT Services controls UDF III.").

[16] SAC ¶ 30.

[17] *Id.* ¶ 39. The breakdown of ownership interests in UMT Holdings include Etter (30%), Greenlaw (30%), Wissink (10.09%), Wilson (7.41%), Youngblood (4.83%), and Obert (4.82%). *Id.* UMT Holdings also owns UMTH General, which manages and advises UMT's day-to-day operations. *Id.* ¶¶ 38, 39. UMTH General's general partner is UMT Services. *Id.* ¶ 30(d).

Etter and Greenlaw formed UDF I in 2003, nonparty United Development Funding II, L.P. ("UDF II") in 2004, and UDF III in 2005.[18] UDF X, UDF IV, and UDF V were formed in 2007, 2009, and 2013, respectively.[19] UDF I, UDF II, UDF III, UDF IV, UDF V, and UDF X are each referred to as a "UDF Fund" or collectively as the "UDF Funds."

UDF III is governed by the Second Amended and Restated Agreement of Limited Partnership, dated April 21, 2006 (the "Partnership Agreement").[20] According to the Partnership Agreement, UDF III was formed "[t]o originate, acquire, service and otherwise manage . . . a diversified portfolio of mortgage loans on real property . . . and to issue or acquire an interest in credit enhancements to borrowers (i.e., guarantees or letters of credit) . . . ."[21] UDF III is a public, unlisted limited partnership.[22]

UMTH LD receives a 0.25% annual servicing fee from UDF III for all of UDF III's outstanding loan balances.[23] Accordingly, UMTH LD would receive a

---

[18] *Id.* ¶¶ 3, 47.

[19] *Id.* ¶¶ 41, 43, 55.

[20] The Second Amended and Restated Agreement of Limited Partnership of UDF III is attached as Exhibit A to the Entity Defendants' Opening Brief, Dkt. 125.

[21] SAC ¶ 64 (citing Partnership Agreement § 4.1).

[22] *Id.* ¶ 56. UDF III registered with the SEC, can sell to the investing public, and is required to file reports with the SEC, but because UDF III is unlisted, there is no public market for UDF III's LP Units. *Id.*

[23] *Id.* ¶ 257.

higher servicing fee if UDF III did not write down its loans. UDF III paid the General Partner over $7.6 million in mortgage servicing fees through September 2015.[24] In addition to fees from UDF III, UMTH LD has financial interests in UDF I and UDF II. First, UMTH LD receives an asset management fee from UDF I and UDF II.[25] Second, UMTH LD owns a 49.99% subordinated profits interest in UDF I and a 49.95% subordinated profits interest in UDF II, and would receive distributions that UDF I or UDF II paid in accordance with those subordinated profits interests.[26]

UMTH LD is the general partner of UDF III and, as noted above, UMT Services is the general partner of UMTH LD. Plaintiffs allege that, because UMT Services is the general partner to UMTH LD, UMT Services controls UDF III, and that the Individual Defendants control UMTH LD because they are officers and/or directors of UMTH LD and/or UMT Services.[27] In addition to their ownership of UMT Holdings, the Individual Defendants hold the following positions:

---

[24] *Id.*

[25] *Id.* ¶¶ 29(b), 340(a)-(b). The amount UMTH LD received through the asset management fee is not alleged.

[26] *Id.* The amount UMTH LD received through these subordinated profits interests is not alleged.

[27] *Id.* ¶¶ 60-62.

- Etter is UDF III's original limited partner.[28] Etter is also the executive vice president of UMTH LD, and a 50% owner, chairman, and director of UMT Services.[29] Plaintiffs also allege that "UMT has been externally managed by an advisor controlled by Defendant Etter since its formation."[30]

- Greenlaw is the current chief executive officer and former president of UMTH LD, and a 50% owner, president, chief executive officer, and director of UMT Services.[31]

- Wilson is the current president, former senior vice president of marketing, and a partner of UMT Holdings;[32] and executive vice president and director of UMT Services.[33] In addition, Wilson is alleged to have "directed the capital raise of over $1 billion across the affiliated entities."[34]

---

[28] *Id.* ¶ 31.

[29] *Id.* ¶ 31(a)-(b).

[30] *Id.* ¶ 45.

[31] *Id.* ¶ 32(a)-(b).

[32] *Id.* ¶ 33(b).

[33] *Id.* ¶ 33(c).

[34] *Id.* ¶ 33(f).

- Wissink is the current president and former chief operating officer of UMTH LD;[35] a partner of UMT Holdings;[36] and chief operating officer of UMT Services.[37] Etter, Greenlaw, and Wissink are also the three voting members of UMTH LD's investment committee, and are

---

[35] *Id.* ¶ 34(a).

[36] *Id.* ¶ 34(b).

[37] *Id.* ¶ 34(c).

alleged to have "made all investment, loan underwriting, and impairment decisions" on behalf of UDF III.[38]

- Obert is the chief financial officer of UMTH LD;[39] the former chief financial officer, former controller, and a partner of UMT Holdings;[40] and the treasurer of UMT Services.[41]

---

[38] *Id.* at Ex. 1 ¶¶ 11-13, 46 (Complaint, *Sec. and Exch. Comm'n v. United Dev. Funding III, L.P., et. al.*, 3:18-cv-01735-L (N.D. Tex. 2018) [hereinafter the "SEC Complaint" or "SEC Compl."]. The Court may consider the SEC Complaint and consent judgments, attached as Exhibits 1-3 to Plaintiffs' Complaint, because the Complaint quotes from and incorporates them by reference. *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 n.28 (Del. 2004) (noting that the court may take judicial notice of contents of court records from another jurisdiction and SEC filings (citing *Southmark Prime Plus, L.P. v. Falzone*, 776 F.Supp. 888, 891-92 (D. Del. 1991))); *see also In re LendingClub Corp. Deriv. Litig.*, 2019 WL 5678578, at *5 & n.24 (Del. Ch. Oct. 31, 2019) (taking judicial notice of an order by the SEC instituting proceedings against the defendants because "the Complaint quotes from and thus incorporates it by reference"); *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 564, 578 (Del. Ch. 2007) (relying on a consent judgment with the SEC). Defendants' argument that this Court may not consider the substance of the allegations contained in the SEC Complaint and consent judgments is not persuasive. Oral Arg. Tr. 34, Dkt. 142 (Walsen, counsel for Entity Defendants); *see also* Entity Defs.' Opening Br. 27-28, Dkt. 125. Defendants rely upon *Lipsky v. Commonwealth United Corporation*, in which the Second Circuit held that "neither a complaint nor references to a complaint which results in a consent judgment may properly be cited in the pleadings under the facts of this case." 551 F.2d 887, 893 (2d Cir.1976). The court in *Lipsky* based that holding on Federal Rule of Evidence 410, which prohibits a plea of *nolo contendere* from being later used against the party who so pleaded, and struck references to a consent decree and complaint as immaterial under Federal Rule of Civil Procedure 12(f). *Id.* at 894. Courts have typically limited the application of *Lipsky* to prevent settlements and their pleadings from being admitted as evidence in subsequent litigations only as to liability, but allowed them to be admissible for other purposes, including proof of knowledge. *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 622 (S.D.N.Y. 2014); *see also In re Morgan Stanley Van Kampen Mut. Fund Sec. Litig.*, 2006 WL 1008138, at *2, 5, 7, & n.14 (S.D.N.Y. Apr. 18, 2006) (holding that SEC and NASD settlement agreements were not legal precedents with a preclusive effect, but taking judicial notice of factual allegations from the SEC and NASD settlement agreements).

- Youngblood is the chief operating officer of UTMH LD;[42] a partner of UMT Holdings;[43] and the executive vice president of UMT Service.[44]

## C.    Overview of the Challenged Transactions

The UDF Funds raise investor funds for the purpose of making loans to fund real estate development. To do so, UMT loaned money to UDF I and UDF II, which, in turn, loaned money to real estate developers.[45] The collapse of the real estate markets beginning in 2007 resulted in the insolvency of many real estate lenders and real estate developers.[46] Consequently, UMT, UDF I, and UDF II were faced with substantial impending liabilities, loan impairments, and losses relating to their loans.[47] Rather than writing down the value of the loans held by UMT, UDF I, and UDF II, however, certain Defendants used UDF III's assets to make and increase loans and loan-related commitments to the earlier-formed UDF

---

[39] SAC ¶ 35(a).

[40] *Id.* ¶ 35(b).

[41] *Id.* ¶ 35(d).

[42] *Id.* ¶ 36(a).

[43] *Id.* ¶ 36(b).

[44] *Id.* ¶ 36(c). The Court has included a copy of the organizational chart submitted by Plaintiffs, *id.* ¶ 44, as an Appendix to this Opinion.

[45] *Id.* ¶ 48.

[46] *Id.* ¶ 69.

[47] *Id.*

Funds.[48]  In addition, UDF III made loans to two Texas-based real estate developers and their affiliates to enable them to repay earlier loans from UMT, UDF I, and UDF II.[49]  Plaintiffs contend that Defendants wanted to conceal the losses facing UMT, UDF I, and UDF II to ensure that they would continue to receive distributions and fees from those earlier-formed United Development Fund entities and to continue raising investor capital.[50]  The scheme is alleged to have continued when later-formed UDF Funds directed funds and their Developer Borrowers to UDF III to prop up distributions to its own Limited Partners.[51]

Plaintiffs challenge four core groups of transactions:  (1) UDF III's purchase of a participation interest in UMT's loan to UDF I; (2) UDF III's loans to other UDF Funds or their subsidiaries; (3) UDF III's guarantees of loans owed by other UDF Funds or their subsidiaries; and (4) UDF III's loans to real estate developers that previously borrowed money from other United Development Funds and modifications to those loans.

### 1.    The UMT Participation Interest Agreement

---

[48] *See, e.g.*, *id.* ¶ 91.

[49] *See, e.g.*, *id.* ¶¶ 6-8.

[50] *Id.* ¶¶ 10-11, 91-92.

[51] *Id.* ¶¶ 13, 145.

Shortly after UDF I's formation in 2003, UMT extended a $7.5 million line of credit to UDF I (the "UMT Loan").[52] The principal amount of the UMT Loan increased several times, and the maturity date was extended multiple times.[53] By 2006, the line of credit had been increased to $45 million.[54] When the real estate markets collapsed, it became unlikely that UDF I would be able to repay the UMT Loan.[55] According to Plaintiffs, Defendants forced UDF III to assume responsibility for the UMT Loan.[56]

In September 2008, UDF III entered into an economic participation agreement with UMT (the "UMT Loan Participation Agreement"), whereby UDF III purchased: (1) a participation interest in the $45 million UMT Loan (the "UMT Participation Interest"), and (2) an option to acquire a full ownership economic participation interest in the UMT Loan (the "UMT Loan Option").[57] Under the UMT Loan Participation Agreement, UDF III agreed to reimburse UMT for all funds advanced to UDF I through the UMT Loan, regardless of whether the monies were advanced before or after entry into the UMT Loan Participation

---

[52] *Id.* ¶ 79. UMT also made loans to UDF II. *Id.* ¶ 48.

[53] *Id.* ¶¶ 79, 100.

[54] *Id.* ¶ 79.

[55] *Id.* ¶ 80.

[56] *Id.* ¶ 98.

[57] *Id.*

Agreement.[58] The UMT Loan amount was increased multiple times after UDF III entered into the UMT Loan Participation Agreement.[59] On April 1, 2015, UDF III exercised the UMT Loan Option, which converted UDF III's economic interest in the UMT Loan into a full participation interest.[60] The UMT Loan Participation Agreement effectively shifted the responsibility for the UMT Loan from UMT to UDF III.[61]

At the time of the UMT Loan Participation Agreement, Defendants knew that UDF I would be unable to repay the loan without new investor capital.[62] Plaintiffs allege that the UMT Loan Participation Agreement and the exercise of the UMT Loan Option were self-interested acts that benefited Defendants to the detriment of UDF III and the Limited Partners.[63] Plaintiffs allege these transactions permitted Defendants to fund UMT shareholder distributions in 2008 and 2009, increased management and servicing fees, increased the value of UMTH LD's subordinated profits interest in UDF I, and concealed losses from securities

---

[58] *Id.*

[59] *Id.* ¶ 100.

[60] *Id.* ¶ 104.

[61] *Id.* ¶ 98.

[62] In its Annual Report for 2007, UMT disclosed that "continued or further deterioration of homebuilding conditions or in the broader economic conditions of the homebuilding market could . . . increase the likelihood of a default on the [UDF I] line of credit loan." SAC ¶ 80 (quoting UMT, Form 10-K (filed Mar. 31, 2008)).

[63] SAC ¶ 105.

broker-dealers to continue raising investor capital.[64] Plaintiffs allege that, based on "the available evidence," UDF I is (as of the filing of the Complaint) insolvent and that UDF III sustained massive losses as a consequence of its investment in the UMT Participation Interest.[65]

## 2.     Loans to Other UDF Funds

Plaintiffs allege that Defendants caused UDF III to make several self-interested loans to UDF I, UDF I's wholly owned subsidiary Northpointe LLC, and UDF X.

In December 2006, UDF III loaned approximately $6.3 million to UDF I (the "2006 UDF I Loan").[66] The 2006 UDF I Loan was originally scheduled to mature on June 21, 2007.[67] Defendants increased the principal amount of the loan and extended its maturity date on several occasions.[68] On October 1, 2013, UDF I assigned a promissory note payable by "an unrelated party" in exchange for cancellation of the 2006 UDF I Loan.[69] The Complaint alleges that UDF III

---

[64] *Id.* ¶¶ 90-92, 99, 105.

[65] *Id.* ¶ 106. Plaintiffs elected not to pursue a books and records demand for additional information prior to filing any of its complaints.

[66] *Id.* ¶ 108.

[67] *Id.*

[68] *Id.* ¶ 108(a), (b), (e)-(h). By June 30, 2012, the principal amount was $15.5 million, and the maturity date was June 30, 2015. *Id.* ¶ 108(f).

[69] *Id.* ¶ 108(i).

suffered a substantial loss on the 2006 UDF I Loan based on the information Plaintiffs uncovered through SEC filings.[70]

In December 2007, UDF III loaned $6 million to UDF I's wholly owned subsidiary, Northpointe LLC (the "UDF NP Loan").[71] In 2011, the loan amount was increased to $15 million, and the maturity date was extended to December 2013, which was further extended two additional times to December 2015.[72] UDF I's subsidiary has not satisfied the loan.[73] As of September 30, 2015, the UDF NP Loan had been transferred from UDF III to UDF IV.[74]

In November 2007, UDF III loaned $70 million to UMTH LD's wholly owned subsidiary, UDF X (the "UDF X Loan").[75] The loan's maturity date was extended four times—most recently in 2015 to extend the maturity date to November 2016—but UDF X has not made timely payments on this loan since 2014.[76]

---

[70] *Id.* ¶ 108(j).

[71] *Id.* ¶ 109.

[72] *Id.* ¶ 109(c)-(d).

[73] *Id.* ¶ 109(f).

[74] *Id.*

[75] *Id.* ¶¶ 111-12.

[76] *Id.* ¶¶ 113-14, 235-36.

### 3.     The Guarantees

From 2009 through 2014, UDF III entered into eight agreements guaranteeing loan obligations totaling $96.9 million owed by UDF IV, UMT, UDF I, or their subsidiaries (the "Guarantees").[77]  Plaintiffs allege that the controllers of UDF III knew that UDF IV, UMT, and UDF I lacked the ability to satisfy their underlying loan obligations and that UDF III's controllers used UDF III's assets to satisfy the loan obligations of these entities.[78]  For example, UDF IV's loan obligations represent approximately $85 million of the $96.9 million UDF III guaranteed.[79]  UDF IV does not appear to have the financial ability to satisfy its loan obligations.  In February 2016, following news that the FBI had raided the corporate offices of the UDF Funds, UDF IV stock dropped by more than 50% before trading in UDF IV stock was halted.[80]  In May 2016, UDF IV announced that it defaulted on a $35 million loan from an unaffiliated party.[81]  Plaintiffs allege that because of UDF IV's financial condition UDF III's assets and value were put at risk through the Guarantees.

---

[77] *Id.* ¶¶ 248, 251, 255.

[78] *See id.* ¶¶ 246, 250, 254, 256.

[79] *Id.* ¶ 223.

[80] *Id.* ¶¶ 17(g)-(h), 225.

[81] *Id.* ¶ 223.

### 4. The Developer Borrower Loans

From 2003 to 2006, UDF I extended at least 27 loans to Buffington Land Development, LLC ("Buffington Land") and its affiliates and at least 13 loans to CTMGT, LLC ("CTMGT") and its affiliates (collectively, as defined above, the "Developer Borrowers").[82] UMT also made multiple loans to the Developer Borrowers.[83]

Shortly after its formation, UDF III began loaning money to the Developer Borrowers.[84] Plaintiffs allege that UDF III's direct loans to the Developer Borrowers were not used to fund real estate development projects, but rather to pay down their earlier loans from UDF I and UDF II.[85] This repayment scheme is alleged to have allowed UDF I and UDF II to continue making distributions to their investors.[86]

Plaintiffs point to loans made to Shahan Prairie L.P. ("Shahan Prairie"), an entity affiliated with CTMGT as an example of the scheme. In 2004, UDF I made

---

[82] *Id.* ¶¶ 71, 76. UDF III participated pro rata in all of UDF I's loans to the Developer Borrowers. *Id.* ¶ 76.

[83] *Id.* ¶¶ 71, 75.

[84] *Id.* ¶ 121. Plaintiffs also contend that Buffington Land is not a third-party borrower because UMTH LD is a limited partner of Buffington Homebuilding Group, Ltd., an affiliate of Buffington Land. *Id.* ¶ 74.

[85] *Id.* ¶ 122. Plaintiffs theorize that the Developer Borrowers willingly participated in this scheme because their total indebtedness remained the same and their costs may have even gone down because UDF III loaned money at lower rates than its earlier affiliates. *Id.* ¶ 124.

[86] *Id.* ¶ 122.

17

real estate development loans to Shahan Prairie.[87] In September 2007, UDF III loaned approximately $1.9 million to Shahan Prairie, an entity affiliated with CTMGT, and later increased the loan to approximately $4.8 million.[88] In November 2007, Shahan Prairie repaid the loan to UDF I in full.[89] In June 2015, UDF V made an $18.1 million loan to Shahan Prairie, and "[i]mmediately thereafter, [Shahan] Prairie repaid its loan in full to UDF III."[90] Yet more than a decade after UDF I made the initial real estate development loan to Shahan Prairie, the land owned by Shahan Prairie remains undeveloped.[91] Plaintiffs contend the loans to Shahan Prairie serve as "a clear example of Defendants' practice of causing successive affiliated entities to make loans to real estate developers that had borrowed from earlier affiliated entities."[92]

In December 2007, UDF III loaned $25 million to CTMGT (the "CTMGT Loan") secured by multiple investments that are cross-collateralized and secured by collateral-sharing arrangements, which allocate the proceeds of the co-investment collateral between UDF I and UDF III. The CTMGT Loan

---

[87] *Id.* ¶¶ 129-30.

[88] *Id.* ¶ 131.

[89] *Id.*

[90] *Id.* ¶ 132.

[91] *Id.* ¶ 281.

[92] *Id.* ¶ 129.

commitment was increased to $112.9 million over the next several years.[93] Effective July 1, 2015, UDF III agreed to defer some or all of its payment preference to allow CTMGT to pay UDF I before UDF III.[94]

Although it remains unclear from the pleadings the exact date when UDF III's loans to Buffington Land first began, the Complaint alleges that UDF III extended loans to Buffington Land soon after UDF III was initially formed.[95] UDF III also increased the principal loan balance to Buffington Land over the years, from $77 million as of March 2013 to more than $122 million by January 2016, while knowing Buffington Land was unable to pay the loans and concealing this information from the Limited Partners.[96] On December 2016, UDF III forgave Buffington Land's $122 million of indebtedness for minimal consideration and personal releases.[97] Plaintiffs also allege that UDF III will be forced to record impairments on its loans to CTMGT.[98]

---

[93] *Id.* ¶¶ 140-41.

[94] *Id.* ¶ 142.

[95] *See id.* ¶ 121.

[96] *Id.* ¶¶ 151, 153, 214; *see also* SEC Compl. ¶¶ 35-40.

[97] SAC ¶ 183; *see also id.* ¶ 217 ("The UDF Funds entered into an agreement releasing Buffington Land and its affiliates and subsidiaries from any and all liabilities, including forgiveness of UDF III's $122 million loan, in exchange for '6 finished residential lots and approximately 4.56 acres of land in Pflugerville, Travis County, Texas.'").

[98] *Id.* ¶ 222.

Plaintiffs allege that the loans to the Developer Borrowers also violate the concentration limit set in the Partnership Agreement, which prohibits UDF III from investing more than 20% of its offering proceeds in loans to any borrower.[99]

**D.  UDF III's Auditor Resigns, and the Partnership Ceases Distributions.**

As of September 20, 2015, more than 90% of UDF III's loan portfolio consisted of loans to UDF I and its subsidiaries, UDF X, and the Developer Borrowers.[100]  These loans consisted primarily of:  a balance of approximately $71.2 million of the UMT Participation Interest in the UMT Loan; a balance of approximately $16.4 million in the UDF X Loan; a balance of approximately $106.5 million in loans to Buffington Land; a balance of approximately $115.9 million in loans to CTMGT with an additional balance in loans to CTMGT's affiliates that comprised approximately 13% of the Partnership's outstanding loan portfolio.[101]  Plaintiffs allege that each of these counterparties is insolvent and will not be able to repay these loans to UDF III.[102]

---

[99] *Id.* ¶¶ 291-93.  The Partnership Agreement requires that no more than 20% of UDF III's offering proceeds may be invested in loans to any one borrower.  Partnership Agreement § 11.3(b).

[100] SAC ¶ 238.

[101] *Id.*

[102] *See id.* ¶¶ 239-44.

In November 2015, the long-time outside auditor to UDF III, the General Partner, UMT, UDF I, UDF II, UDF IV, UDF V, and UDF Holdings resigned.[103] UDF III ceased filing quarterly and annual reports with the SEC in November 2015, and despite engaging a new auditor in June 2016, has not resumed the filing of quarterly or annual reports.[104] After January 2016, UDF III ceased paying distributions to its Limited Partners.[105]

### E. The SEC Investigates and Files an Action Against UDF III, UDF IV, and Certain Individual Defendants.

Three weeks after announcing the resignation of its auditor, the Partnership announced that UDF III and UDF IV had been the subjects of a nonpublic fact-finding investigation by the SEC that began in April 2014.[106] On October 18, 2016, UDF III revealed in a Form 8-K filing that UDF III, UMTH LD, and certain of the Individual Defendants had received Wells Notices[107] from the SEC, in which the SEC had made a preliminary determination to recommend filing an enforcement action against UDF III and certain unnamed individuals "associated

---

[103] *Id.* ¶¶ 17(a), 197, 269.

[104] *Id.* ¶¶ 197-99.

[105] *Id.* ¶ 17(e).

[106] *Id.* ¶ 148.

[107] A Wells Notice is a notification from the SEC that it intends to recommend bringing an enforcement action against a company or individual and to provide them with an opportunity to respond before the recommendation. *See* 17 C.F.R. § 202.5(c) (2008).

with the Partnership and its general partner."[108]  The October 18, 2016 Form 8-K,

signed by the General Partner stated the Partnership's belief that "no enforcement

action is warranted against the Partnership or any individuals associated with the

Partnership and its general partner" and that "the Partnership intends to contest any

charges that may be brought."[109]

On July 18, 2018, the SEC filed a complaint against UDF III, UDF IV,

Greenlaw, Etter, Wissink, Obert, and David Hanson,[110] accusing them of loaning

money from UDF IV to the Developer Borrowers, so that the Developer Borrowers

could pay back their loan from UDF III with UDF IV's money and allow UDF III

to pay distributions (the "SEC Action").[111]  The SEC Complaint alleges that the

defendants violated Sections 17(a)(2) and (3) of the Securities Act of 1933 and

Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Securities Exchange Act of

1934.  The SEC Complaint alleges that Etter, Greenlaw, Wissink, and Obert were

involved in all of the "investment, loan underwriting and impairment decisions for

---

[108] SAC ¶ 148.

[109] UDF III, Form 8-K (filed Oct. 18, 2016); *see* SAC ¶ 148 (quoting the Form 8-K).  The Form 8-K is incorporated by reference into the Complaint.  *Wal-Mart Stores*, 860 A.2d at 320 (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

[110] David Hanson is the Chief Accounting Officer and former Chief Operating Officer for UDF IV.  SEC Compl. ¶ 15.  Hanson is not alleged to have served a role on UDF III.  *Id.* ¶ 49 ("During the Relevant Period, Hanson did not hold a position at UDF III and did not serve on the UDF Investment Committee or participate in its investment, loan underwriting, and impairment decisions.").

[111] SAC ¶ 149; *see also* SEC Compl. ¶¶ 1, 3.

UDF III and UDF IV."[112] Etter, Greenlaw, Wissink, and Obert are alleged to have known that the loans to the Developer Borrowers were not being used to develop projects and directed the Developer Borrowers to use the proceeds to pay down interest and principal on the Developer Borrowers' outstanding loans to UDF III.[113] On the same day that the SEC Complaint was filed, each of the defendants in the SEC Action entered into consent judgments, whereby Greenlaw, Etter, Wissink, and Obert agreed to collectively pay $7.45 million in disgorgement, prejudgment interest, and civil penalties.[114] Plaintiffs have attached and incorporated by reference the SEC Complaint and the consent judgments into the Complaint.[115]

### F. Hayman Capital Management Reports on the UDF Scheme.

In December 2015, Hayman Capital Management, L.P. ("Hayman"), a hedge fund with a short position in the stock of UDF IV, began to publish reports accusing certain Defendants of using loans by newer UDF Funds to bail out and

---

[112] SEC Compl. ¶¶ 11-14, 46.

[113] SAC ¶ 250, SEC Compl. ¶ 27.

[114] SAC Exs. 2-3.

[115] *Id.* at Exs. 1-3. Under the consent judgments, UDF III, UDF IV, Greenlaw, Etter, Wissink, and Obert did not admit or deny the allegations of the SEC Complaint, but agreed to be permanently restrained and enjoined from violation of Sections 17(a)(2) and (3) of the Securities Act and Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act. *Id.* at Exs. 2-3 ¶ 2.

support loans made by earlier UDF Funds.[116] The Complaint does not attach any of Hayman's reports, but relies on Hayman's allegations that "new investor money" raised through UDF III, UDF IV, and UDF V provided liquidity to earlier-formed United Development Fund entities.[117] Hayman noted that UDF III's loan portfolio was concentrated in loans to the two Developer Borrowers that had borrowed from earlier-formed UDF Funds.[118] Hayman also raised concerns about the resignation of the UDF Funds' auditor.[119]

## G.    This Litigation

On July 7, 2016, Plaintiffs filed a Verified Derivative and Class Action Complaint for Breach of Fiduciary Duties against entities and individuals related to

---

[116] *Id.* ¶¶ 17(c), 273.  Several United Development entities filed suit against Hayman and others challenging Hayman's reports and assert claims for, *inter alia*, business disparagement, tortious interference with contract and business relationship, and civil conspiracy. *See United Dev. Funding, L.P., et al. v. Hayman Capital Management, L.P., et al.*, Case No. CC-17-06253-B (County Court at Law No. 2, Dallas County, Texas) (Nov. 28, 2017); *see also Bass v. United Dev. Funding, L.P.*, 2019 WL 3940976, at *1 (Tex. App. Aug. 21, 2019), *review denied* (Mar. 13, 2020).  On June 11, 2018, the court in that action entered an order denying Hayman's motion to dismiss under the Texas Citizens Participation Act, finding that the plaintiffs had established a *prima facie* case against Hayman. *See* Entity Defs.' Opening Br. 9, n.3.  On August 21, 2019, the Court of Appeals for the Fifth District of Texas affirmed the trial court's denial of Hayman's motion to dismiss, finding that Hayman had motive to maximize profits from its $59 million short position in UDF IV. *See Bass v. United Dev. Funding, L.P.*, 2019 WL 3940976, at *1; Entity Defs.' Reply Br. 1, Dkt. 137.

[117] SAC ¶ 17(c).

[118] *Id.* ¶ 17(c).

[119] *Id.* ¶ 273.

the Entity Defendants.[120]  On March 17, 2017, Plaintiffs amended that complaint.[121]

On January 16, 2018, the Court stayed this action pending the resolution of five earlier-filed actions pending in the United States District Court for the Northern District of Texas that included claims against many of the same Defendants here (the "Texas Actions").[122]

On March 28, 2019, following the resolution of the Texas Actions and the SEC Action, the Court entered the parties' stipulation to lift the stay of this action.[123]  On April 29, 2019, Plaintiffs filed the Complaint, incorporating allegations from the SEC Complaint and consent judgments.  The Complaint contains seven counts.  Counts I, III-V, and VII are pleaded as derivative claims, and Counts II and VI are pleaded as direct claims.

- **Count I ("Derivative Claim, On Behalf of UDF III, For Breach of Fiduciary Duty"):** Count I is a derivative claim on behalf of UDF III against Etter, Greenlaw, Wilson, Wissink, Obert, Youngblood, UMT

---

[120] Dkt. 1.

[121] Am. Derivative and Class Action Compl.  Dkt. 54.

[122] Order Granting Mot. to Stay. Dkt. 93.  The "Texas Actions" include the federal derivative actions on behalf of UDF IV and UDF V, *Evans v. Greenlaw et al*, 3:16-cv-00635 (N.D. Tex.), and the federal and state law securities class actions on behalf of purchasers of UDF IV and UDF V stock, *In re United Dev. Funding IV Sec. Litig.*, Case No. 3:15-cv-4030-M (N.D. Tex.) and *Hay v. United Dev. Funding IV, et al.*, Case No. 4:16-cv-00188 (N.D. Tex.).

[123] Dkt. 117.

Services, and UMTH LD for breach of fiduciary duty. Plaintiffs allege that UMTH LD owes fiduciary duties to UDF III because it is the general partner of UDF III;[124] that UMT Services owes fiduciary duties because it is the general partner of UMTH LD; that Etter and Greenlaw owe fiduciary duties because they are the "ultimate controllers and owners of UMT Services";[125] that Etter, Greenlaw, and Wilson owe fiduciary duties because they are directors and officers of UMT Services and "controllers of the decisions and conduct which injured UDF III";[126] and that Wissink, Obert, and Youngblood owe fiduciary duties as "senior executive decision-makers concerning the conduct that injured UDF III."[127] Plaintiffs argue that each of these Defendants breached their fiduciary duties through "conflicted and self-dealing conduct."[128]

- **Count II: ("Direct Claim, On Behalf of the Class, for Breach of Fiduciary Duties"):** Count II asserts a direct claim on behalf against Etter, Greenlaw, Wilson, Wissink, Obert, Youngblood, UMT

---

[124] SAC ¶ 357.

[125] *Id.* ¶ 354.

[126] *Id.* ¶ 355.

[127] *Id.* ¶ 358.

[128] *Id.* ¶¶ 354-58.

26

Services, and UMTH LD for the same breach of fiduciary duty.[129] Plaintiffs allege these Defendants breached their fiduciary duties by their decision to cease distributions of the Cash Available for Distribution to UDF III's Limited Partners since January 2016 and by omitting and misstating material information provided to the Limited Partners concerning UDF III and its assets.[130]

- **Count III ("Derivative Claim, On Behalf of UDF III, for Waste of Partnership Assets"):** Count III alleges that Etter, Greenlaw, Wilson, Wissink, Obert, Youngblood, UMT Services, and UMTH LD wasted Partnership assets by engaging in the challenged loan transactions and for failing to enforce UDF III's rights under the loan agreements.[131] In response to Defendants' briefs, Plaintiffs have abandoned this claim as to all defendants except UMTH LD.[132]

- **Count IV ("Derivative Claim, On Behalf of UDF III, for Aiding and Abetting Breach of Fiduciary Duty"):** Count IV asserts a derivative claim on behalf of UDF III against UMT, UMT Holdings,

---

[129] *Id.* ¶¶ 360-65.

[130] *Id.* ¶ 366.

[131] *Id.* ¶ 370.

[132] Pls.' Ans. Br. 98 n.61.

UMTH General, UDF I, UDF IV, and UDF X for aiding and abetting the breaches of fiduciary duty described in Counts I and II.[133]

- **Count V ("Derivative Claim, on Behalf of UDF III, for Breach of Contract"):** Count V is a derivative claim against UMTH LD for breach of the Partnership Agreement. Plaintiffs contend that by causing UDF III to invest in and/or to make loans to UDF I and its subsidiaries and to the Developer Borrowers, UMTH LD breached Section 11.3(b) of the Partnership Agreement, which provides loan concentration limitations to any single borrower.[134] Plaintiffs allege that UMTH LD also breached the Partnership Agreement by failing to obtain appraisals in connection with the UMT Participation Interest and UMT Option.[135]

- **Count VI ("Direct Claim, on Behalf of the Class, for Breach of Contract"):** Count VI is a direct claim against UMTH LD for breach of the Partnership Agreement. Plaintiffs contend that UMTH LD's decision to cease distributions of the Cash Available for Distribution

---

[133] SAC ¶ 375.

[134] *Id.* ¶¶ 379-80.

[135] *Id.* ¶ 381.

and to cease distributions of financial reports for UDF III breached the Partnership Agreement.[136]

- **Count VII ("Derivative Claim, on Behalf of UDF III, for Unjust Enrichment"):** Count VII is a claim for unjust enrichment against all Defendants.[137]

On June 28, 2019, the Entity Defendants and Individual Defendants each filed separate motions to dismiss the Complaint.[138]  On April 14, 2020, this Court held oral argument on the Motions to Dismiss.[139]

## II.    ANALYSIS

The Defendants have moved to dismiss pursuant to Court of Chancery Rules 12(b)(6) and 23.1.  The Defendants contend the Complaint does not state a claim under Court of Chancery Rule 12(b)(6), because (1) claims based on transactions that occurred and were disclosed more than three years prior to the commencement of this action are barred by laches and statutes of limitations; (2) the Plaintiffs have failed to allege injury; and (3) the Complaint fails to state claims as to each of the causes of actions.[140]  Second, the Individual Defendants argue that they do not owe

---

[136] *Id.* ¶ 385.

[137] *Id.* ¶¶ 389-90.

[138] Entity Defs.' Mot. to Dismiss, Dkt. 125; Individual Defs.' Mot. to Dismiss, Dkt. 124.

[139] Dkt. 142.

[140] Entity Defs.' Opening Br. 2.

fiduciary duties to UDF III or its limited partners.[141] This argument urges the Court to reject the well-established precedent of *In re USACafes, L.P. Litigation*[142] and its progeny, which held that the persons who ultimately control a corporate general partner owe fiduciary duties to the limited partnership. Wissink, Obert, and Youngblood separately argue that even if this Court follows *USACafes*, Counts I, II, and VII should be dismissed as to them because the Plaintiffs have failed to allege that these specific Defendants exercise sufficient control over UDF III to impose fiduciary duties upon them.[143] The Defendants further argue that the derivative claims based upon the transactions with "unaffiliated, third-party borrowers" must be dismissed pursuant to Court of Chancery Rule 23.1 for failure to plead demand futility.[144]

### A.   Motion to Dismiss for Failure to State a Claim

The pleading standards governing a motion to dismiss under Court of Chancery Rule 12(b)(6) are minimal. *Central Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011). On a motion to dismiss for failure to state a claim:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they

---

[141] Individual Defs.' Opening Br. 8.

[142] 600 A.2d 43 (Del. Ch.), *appeal refused*, 602 A.2d 1082 (Del. 1991).

[143] Individual Defs.' Opening Br. 35-41.

[144] Entity Defs.' Opening Br. 2.

give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal citations and quotations omitted); *accord Central Mortg.*, 27 A.3d at 536. Although the Court must accept as true the well-pleaded allegations in the Complaint, the Court "need not accept inferences or factual conclusions unsupported by specific allegations of fact." *Transdigm Inc. v. Alcoa Glob. Fasteners, Inc.*, 2013 WL 2326881, at *4 (Del. Ch. May 29, 2013). "[A] trial court is required to accept only those 'reasonable inferences that logically flow from the face of the complaint' and 'is not required to accept every strained interpretation of the allegations proposed by the plaintiff.'" *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1082 (Del. 2001)). "Moreover, a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law." *Malpiede*, 780 A.2d at 1083.

### 1. Plaintiffs' Claims Predating July 7, 2013 Are Partly Barred By Laches.

"Laches is an affirmative defense that the plaintiff unreasonably delayed in bringing suit after learning of an infringement of his or her rights. . . . In

31

determining whether an action is barred by laches, the Court of Chancery will normally . . . apply the period of limitations by analogy." *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 769 (Del. 2013). The statute of limitations governing each of Plaintiffs' claims is three years. *Dubroff v. Wren Holdings*, LLC, 2011 WL 5137175, at *12 (Del. Ch. Oct. 28, 2011) (breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and unjust enrichment); *Marnavi S.p.A. v. Keehan*, 900 F. Supp. 2d 377, 395 (D. Del. 2012) (waste of partnership assets); *Bear Stearns Mortg. Funding Tr. 2006-SL1 v. EMC Mortg. LLC*, 2015 WL 139731, at *6 (Del. Ch. Jan. 12, 2015) (breach of contract). Under Delaware law, "a cause of action accrues 'at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action.'" *ISN Software Corp. v. Richards, Layton & Finger, P.A.*, 226 A.3d 727, 732 (Del. 2020) (quoting *Wal-Mart Stores*, 860 A.2d at 319), *reargument denied* (Mar. 20, 2020). The Plaintiffs filed their original complaint on July 7, 2016, and by analogy, transactions that occurred and were disclosed prior to July 7, 2013 are barred by laches.

Defendants list twelve transactions that they argue are barred by laches, in full or in part.[145] These transactions include loans in which the borrowed amounts were increased and the maturity dates were extended multiple times after their

---

[145] Entity Defs.' Opening Br. 36-37 (list of conduct challenged as time-barred because they are based on "allegations relying in whole or in part upon conduct that occurred prior to July 2013").

origination. The parties, however, have acknowledged that extensions and increases in lending which occurred within the three-year limitations period would not be barred by laches, even if they relate to a loan or agreement that originated prior to the three-year limitations period.[146] Thus, as a practical matter, the only transactions that are subject to the three-year limitations period are the transactions that occurred prior to July 7, 2013, rather than the later extensions and increases to the loans, which could independently serve as the basis for a claim. Therefore, the transactions at issue here are:

(1) Originating and four increases in, and extensions to the maturity date of, the UDF I Loan;[147]
(2) Entry into the UMT Participation Interest Agreement;[148]
(3) Originating and an increase in, and extension to the maturity date of, the UDF NP Loan;[149]
(4) Originating the UDF X Loan;[150]
(5) Guaranteeing UMTHF's loan;[151]

---

[146] *See, e.g.*, Oral Arg. Tr. 59:22-60:4 (Walsen, counsel for Entity Defendants) (challenging the extension of the maturity date and increase in loan balance to the 2006 UDF I Loan that occurred before 2013); *id.* at 69:12-19 (Kriner, counsel for Plaintiffs).

[147] SAC ¶ 108 (alleging that UDF III originated the 2006 UDF I Loan in December 2006 and that the amount of the 2006 UDF I Loan was increased and its maturity date extended four times before December 2012).

[148] *Id.* ¶¶ 98-100 (alleging that UDF III entered into the UMT Loan Participation Agreement in September 2008, that UMT advanced funds to its shareholders in 2008 and 2009, and that the commitment in the UMT Loan was increased and its maturity date extended twice before the beginning of 2013).

[149] *Id.* ¶ 109 (alleging that UDF III originated the UDF NP Loan in December 2007 and that, before September 2011, the amount of the UDF NP Loan was increased to $15 million and its maturity date extended to December 2013).

[150] *Id.* ¶¶ 111-13 (alleging that UDF III originated the UDF X Loan in November 2007).

(6)    Guaranteeing UDF IV Home Finance, L.P.'s loan;[152]

(7)    Guaranteeing UMT 15th Street L.P.'s loan;[153]

(8)    Guaranteeing UDF IV Acquisitions L.P.'s loan;[154]

(9)    Guaranteeing UDF IV Finance II L.P.'s loan;[155]

(10)  Guaranteeing UMT HF III L.P.'s loan;[156]

(11)  Originating the loan to Shahan Prairie, an affiliate of CTMGT;[157] and

(12)  Entering into the CTMGT Loan.[158]

---

[151] *Id.* ¶ 118(1) (alleging that UDF III entered into a guaranty agreement in August 2009 binding UDF III as the guarantor for UMTHF's repayment of a loan to Texas Capital Bank, National Association).

[152] *Id.* ¶ 118(2) (alleging that UDF III entered into a guaranty agreement in April 2010 binding UDF III as the guarantor for UDF IV Home Finance L.P.'s repayment of a loan to Community Trust Bank of Texas).

[153] *Id.* ¶ 118(3) (alleging that UDF III entered into a guaranty agreement in April 2010 binding UDF III as the guarantor for UMT 15th Street, L.P.'s repayment of a loan to Community Trust Bank of Texas and that UMT 15th Street is a wholly owned subsidiary of UMT).

[154] *Id.* ¶ 118(4) (alleging that UDF III entered into a guaranty agreement in August 2010 binding UDF III as the guarantor for UDF IV Acquisitions, L.P.'s repayment of a loan to Community Trust Bank of Texas and that UDF IV Acquisitions, L.P. is a wholly owned subsidiary of UDF IV).

[155] *Id.* ¶ 118(5) (alleging that UDF III entered into a guaranty agreement in December 2010 binding UDF III as the guarantor for UDF IV Finance II's repayment of a loan to The F&M Bank and Trust Company n/k/a Prosperity Bank, and that UDF IV Finance II is a wholly owned subsidiary of UDF IV).

[156] *Id.* ¶ 118(6) (alleging that UDF III entered into a guaranty agreement in May 2011 binding UDF III as the guarantor for UMT HF III's repayment of a loan to Veritex Community Bank, N.A., and that UMT HF III is a wholly owned subsidiary of UMT).

[157] *Id.* ¶¶ 130-31 (alleging that UDF III loaned $1.9 million to Shahan Prairie in September 2007 and that it increased its loan twice before the end of 2012); *see also id.* ¶ 132 that Shahan Prairie repaid the loan to UDF III in June 2015, after UDF V made an $18.1 million loan to Shahan Prairie).

[158] *Id.* ¶¶ 140 (alleging that UDF III originated a secured loan to CTMGT and its subsidiaries in December 2007, the amount of which was increased twice before the beginning of 2013).

Plaintiffs argue that the analogous statute of limitations must be tolled for two reasons.[159] First, Plaintiffs argue that their claims are subject to equitable tolling, contending that they "reasonably relied . . . upon the Fiduciary Defendants to make and disclose investments in good faith in accordance with their fiduciary duties."[160] Plaintiffs argue that they were not aware of any issues with UDF III until late 2015, "when the [UDF III's] auditor resigned, [UDF III] acknowledged that it had been subject to an SEC investigation since April 2014, Hayman Capital issued reports regarding the self-dealing conduct within the UDF family of entities, and the Fiduciary Defendants halted payment of limited partnership distributions."[161] Second, Plaintiffs broadly contend that the Complaint generally demonstrates that Defendants engaged in fraudulent concealment until 2015.[162]

### a. Plaintiffs' Claims Relating to the Developer Borrower Loans, the UMT Loan, and the UMT Participation Interest Agreement Are Equitably Tolled.

The doctrine of equitable tolling stops a statute of limitations from running while a plaintiff has "reasonably relied upon the competence and good faith of a

---

[159] "If a *prima facie* basis for laches exists from the face of the complaint, the plaintiff bears the burden to plead specific facts to demonstrate that the analogous statute of limitations was tolled." *Bean v. Fursa Capital P'rs, LP*, 2013 WL 755792, at *4 (Del. Ch. Feb. 28, 2013) (citing *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6 (Del. Ch. July 17, 1998)).

[160] Pls.' Ans. Br. 53.

[161] *Id.* at 54 (citing SAC ¶ 17).

[162] Pls.' Ans. Br. 52.

fiduciary." *Tyson Foods*, 919 A.2d at 585. The statute of limitations resumes running, however, after the injured party is put on inquiry notice of the claim. *In re Ebix, Inc. Stockholder Litig.*, 2014 WL 3696655, at *8 (Del. Ch. July 24, 2014). Plaintiffs bear the burden of pleading facts demonstrating that they were not on inquiry notice of the facts underlying their purported claims. *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008). "No evidence of actual concealment is necessary in such a case, but the statute is only tolled until the investor knew or had reason to know of the facts constituting the wrong." *Tyson Foods*, 919 A.2d at 585 (citations omitted).

According to Plaintiffs, Defendants used each of the challenged transactions to wrongfully cover debts of other affiliated entities at UDF III's expense. UDF III's public filings disclose the challenged transactions but, as described above, Plaintiffs argue that they lacked inquiry notice of the scheme in late 2015, when a hedge fund disseminated a report asserting that the United Development Fund entities were operating as a "Ponzi-like scheme," UDF III's auditor resigned, and UDF III announced that it was the subject of an SEC investigation.[163] The Complaint sufficiently alleges that Plaintiffs were not on inquiry notice of their pre-July 7, 2013 claims relating to the UMT Loan and the UMT Participation

---

[163] SAC ¶ 17 ("In late 2015, information began to surface which cast doubt on the integrity and value of the Partnership's assets and the completeness and candor of the information historically provided to the Limited Partners.").

36

Interest Agreement and the CTMGT Loan. The remainder of Plaintiffs' pre-July 7, 2013 claims are not equitably tolled.

Plaintiffs have alleged that UDF III's disclosures with respect to the CTMGT Loan, the UMT Loan, and the UMT Participation Interest Agreement were misleading. Plaintiffs have alleged that UDF III disclosed that the purpose of the loans was to fund real estate development projects, not to benefit other United Development Funds, as Plaintiffs allege.[164] Plaintiffs are entitled to rely on these disclosures, and the well-pleaded allegation that this disclosure was false refutes that they were on inquiry notice that the loans were being used for another purpose.[165]

---

[164] *Id.* ¶¶ 121-39 (alleging that the loans to the Developer Borrowers were shams to permit them to repay loans to UDF III affiliates at lower rates and that the Limited Partners were misled to believe that the loans "were made for the purpose of funding actual real estate development projects"); *see also* UDF III, Form 10-Q (filed Sept. 30, 2015) ("The purpose of the UMT Loan is to finance UDF I's investments in real estate development projects."). Defendants do not specifically argue that any pre-2013 loans to Buffington Land in their list of transactions are barred by laches, *see* Entity Defs.' Opening Br. 35-37, but that challenge would fail for the same reasons described here. *See also* SEC Compl. ¶¶ 37-40 (alleging that UDF III disclosed in its annual report for 2013 that "full collectability" for the Buffington Land loan was considered "probable," and that "UDF knew or should have known that full collectability . . . was not probable and, at best, highly uncertain."); SAC ¶ 285 (alleging that UDF III made a false representation regarding the bankruptcy proceeding for Lennar Buffington Stonewall Ranch L.P., an affiliate of Buffington Land ("Lennar Buffington")). The SEC Complaint does not identify Buffington Land by name, but the facts of record indicate that the Austin-based developer named in the SEC Complaint was Buffington Land.

[165] *Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, 2007 WL 2982247, at *14 (Del. Ch. Oct. 9, 2007) ("Reasonable reliance on the competence and good faith of fiduciaries can toll the running of the statute of limitations.").

Plaintiffs' allegations with respect to the remainder of their pre-July 7, 2013 claims fail to satisfy their burden to demonstrate that they were not on inquiry notice of their claims. Plaintiffs' first argument is that a November 2015 letter demonstrates that they reasonably relied on UDF III's representations that its loans to affiliates of its general partner were beneficial.[166] On November 9, 2015, certain Defendants issued a letter to the Limited Partners recommending that they reject a tender offer of $14.50. Plaintiffs allege that this was a false representation that the tender offer price was less than the then-current $20 reported unit price and potential long term value of the LP Units. Plaintiffs, however, fail to connect any representation in this letter to the challenged transactions pre-dating July 7, 2013.

In fact, the public filings cited by Plaintiffs disclose the terms of the allegedly wrongful transactions prior to July 7, 2013 and, unlike UDF III's disclosures relating to the UMT Loan and the loans to Developer Borrowers, Plaintiffs have not specifically alleged facts demonstrating that UDF III's disclosures regarding the other challenged transactions misled them. For example, Plaintiffs allege that Defendants originated, increased, and extended the 2006 UDF I Loan at a time when UDF I was unable to meet its loan requirements. While Plaintiffs allege that UDF I is currently insolvent, the Complaint does not contain any well-pleaded allegation that Defendants knowingly extended or increased the

---

[166] Pls.' Ans. Br. 53-54.

2006 UDF I Loan at a time when UDF I was unable to meet its loan obligations before July 7, 2013.[167] Indeed, Plaintiffs acknowledge that they were informed through UDF's 2011 annual report that the principal amount of the 2006 UDF I Loan had increased from $6.9 million when the loan was originated to $12.8 million without any increase in collateral.[168] Plaintiffs' claim that the 2006 UDF I Loan was knowingly undercollateralized is therefore untimely.

Plaintiffs' claims with respect to the UDF X Loan, the UDF NP Loan, the Shahan Prairie loan, and the guarantees to related entities fail for the same reasons: Plaintiffs have failed to plead specific facts establishing that they were not on inquiry notice of their pre-July 7, 2013 claims as to these transactions. Plaintiffs do not allege that UDF III's public filings omitted any information relating to the UDF X Loan. Plaintiffs conclusorily allege that "UDF X was not an economically sound borrower" at the time that UDF III originated the UDF X Loan, but that allegation is contradicted by Plaintiffs' allegation that UDF X made payments under the UDF X Loan to UDF III until 2014.[169] Plaintiffs base their pre-July 7, 2013 claims regarding the UDF NP Loan, the Shahan Prairie loan, and the

---

[167] *See also* SAC ¶¶ 98-110 (alleging that the UMT Loan, the 2006 UDF I Loan, the UDF NP Loan, and the UDF X Loan were made to support UDF I and UDF X at UDF III's expense); ¶¶ 242-44 (alleging that UDF I and UDF X are insolvent).

[168] *Id.* ¶ 108.

[169] *Compare id.* ¶ 112 (alleging that UDF III originated the UDF X Loan in November 2007), *with id.* ¶ 242 (alleging that UDF X stopped making loan payments to UDF III in 2014).

guarantees to related entities on the fact that the transactions were to related entities or that UDF III failed to obtain an increase in collateral at the same time its loans were increased, but as with the 2006 UDF I Loan, these facts were also disclosed to Plaintiffs.[170]

Plaintiffs have thus failed to plead specific facts sufficient to equitably toll their challenges to Defendants' actions with respect to the 2006 UDF I Loan, the UDF X Loan, the UDF NP Loan, and guarantees to UDF affiliates to the extent those acts pre-date July 7, 2013.[171]

### b. Plaintiff Has Not Established Fraudulent Concealment.

Plaintiffs have waived any argument that they have pleaded fraudulent concealment. A statute of limitations may be disregarded when a defendant has "fraudulently concealed from a plaintiff the facts necessary to put him on notice of the truth." *Tyson Foods*, 919 A.2d at 585. Plaintiffs bear the burden of pleading specific facts to demonstrate that the analogous statutes of limitations were tolled.

---

[170] *See id.* ¶ 109 (alleging that UDF III's November 14, 2011 Form 10-Q disclosed that the UDF NP Loan was increased to $15 million without any increase in collateral); *see also* ¶ 118 (describing UDF III's guaranty agreements for affiliates by reference to UDF III's public disclosures), ¶ 131 (alleging, without more, that UDF III provided a loan to Shahan Prairie in 2007).

[171] To the extent that discovery shows that pre-July 7, 2013 claims barred by laches should have been equitably tolled, Plaintiffs may seek to revisit this issue "should future developments provide a compelling reason for doing so," subject to the law of the case doctrine. *In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at \*43 (Del. Ch. June 11, 2020).

*Eni Holdings, LLC v. KBR Grp. Holdings, LLC*, 2013 WL 6186326, at \*13 (Del. Ch. Nov. 27, 2013). "Claims of fraudulent concealment are subject to a heightened pleading standard" and must be stated "with particularity." *IMO Estate of Lambeth*, 2018 WL 3239902 at \*4.

Plaintiffs' argument as to fraudulent concealment is relegated to a footnote, referring to the failure to disclose Buffington Land's inability to satisfy its indebtedness.[172] But Defendants have not argued that Plaintiffs' claims as to that transaction are time-barred.[173] Plaintiffs have not established fraudulent concealment as a basis to avoid laches for their pre-July 7, 2013 claims.[174]

### 2. The Claims Are Not Barred Under the Partnership Agreement.

The Defendants seek dismissal of Counts I-IV and VII (claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, waste, and unjust enrichment) because they are based upon conduct disclosed and permitted in the Partnership Agreement and UDF III's public filings.[175] The Defendants argue that the Plaintiffs bought their LP Units with knowledge that the Partnership Agreement and UDF III's public filings disclosed the potential for the conflicts of

---

[172] *See* Pls.' Ans. Br. 56-57 & n.28.

[173] Entity Defs.' Opening Br. 36-37 (list of conduct challenged as time-barred).

[174] "Issues not briefed are deemed waived." *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999).

[175] Entity Defs.' Opening Br. 38-43.

41

interest and the actions underlying Counts I-IV and VII, and therefore, Plaintiffs cannot now complain about those same transactions.[176]

A limited partner may, under limited circumstances, be precluded from asserting claims based upon conflicts of interest where the conflicts of interest are disclosed in the partnership agreement or a prospectus. *Seafood Funding Ltd. P'shp v. M&M Assocs. II, L.P.*, 672 A.2d 66, 72 (Del. Ch. 1995) ("A conflict of interest disclosed in a *prospectus* or *partnership agreement* and a plaintiff's acceptance of the terms of the prospectus or Partnership Agreement precludes the plaintiff from bringing a derivative claim *based on the facts disclosed* in those documents." (emphasis added)); *see also Boxer v. Husky Oil Co.*, 1983 WL 17937, at *6 (Del. Ch. June 28, 1983) (where partnership agreement and prospectus specifically contemplated that a general partner with a disclosed conflict would play a role in selecting an appraiser, the plaintiffs could not base a cause of action on the mere fact that the general partner in fact played the very role contemplated for it when it came time to select an appraiser), *aff'd*, 483 A.2d 633 (Del. 1984) (ORDER); *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318, 334 (Del. Ch. 2003) ("In some instances, disclosure of conflicts of interest may preclude a claim for breach of the duty of loyalty" (citing *Boxer*, 1983 WL 17937)).

---

[176] *Id.* at 39.

42

Defendants cite only one provision of the Partnership Agreement to support this defense, which they acknowledge merely provides "for the possibility that UDF III may extend loans or engage in transactions with earlier UDF programs."[177] Section 13.3 of the Partnership Agreement prohibits loans to the General Partner or affiliates of the General Partner, except under certain conditions.[178] The Defendants also point to boilerplate disclosures in one of UDF III's public filings about potential conflicts of interest.[179] Defendants cite no authority where a limited partner was barred from bringing a breach of fiduciary duty claim because a potential conflict of interest was recited in a public filing. Thus, Defendants are left with the loan limitation restriction in Section 13.3.[180]

In order to foreclose a plaintiff from complaining about a corporate action, the plaintiff must have "full knowledge of all the facts [in which] he or she has concurred." *Werner*, 831 A.2d at 334. In *Werner*, the Court concluded that a private placement memorandum "did not disclose the potential for conflicts of interest with enough specificity to prevent [the plaintiff] from bringing a duty of

---

[177] *Id.* at 42.

[178] Partnership Agreement § 13.3(a)-(b).

[179] Entity Defs' Opening Br., Ex. J, at 5-6, 12-13 (UDF III, Annual Report (filed Apr. 2, 2007)).

[180] For this reason, Defendants' legal authorities do not carry the day. *Litman v. Prudential-Bache Props., Inc.*, 1993 WL 5922, at *5 (Del. Ch. Jan. 4, 1993) (referring to "acceptance of the terms in the prospectus and partnership agreement"); *Goodman v. Futrovsky*, 213 A.2d 899, 903 (Del. 1965) (conflict disclosed in prospectus).

loyalty claim." *Id.* Just as in *Werner*, Section 13.3 of the Partnership Agreement could not "convey full knowledge" that UMTH LD would cause UDF III to enter into interested transactions with earlier UDF Funds for the purpose of concealing their losses and enabling them to make distributions to their limited partners. *Id.*

This conclusion is further supported by considering the Partnership Agreement as a whole. The Partnership Agreement requires that, "[t]he General Partner shall exercise its fiduciary duty for the safekeeping and use of all funds and assets of the Partnership . . . and shall not employ, or permit another to employ, such funds or assets in any manner except for the exclusive benefit of the Partnership. In addition, the Partnership shall not permit the Partners to contract away the fiduciary duty owed to the Partners by the General Partner under common law."[181] Viewed in context, Section 13.3 cannot be read to foreclose the Limited Partners from pursuing derivative claims for breaches of fiduciary duty. That is particularly true where, as here, the creators of the Partnership chose not to eliminate fiduciary duties owed to the Partnership or the Limited Partners arising from conflicted transactions. *See* 6 *Del. C.* § 17-1101(d); *see also infra* Section II(A)(4)(b).

---

[181] Partnership Agreement § 11.3(g).

44

### 3.    The Complaint Adequately Alleges Injury.

Defendants argue that the Plaintiffs have failed to allege injury arising from the challenged conduct. Defendants contend that "most losses alleged in the [Complaint] either are losses allegedly sustained by a UDF affiliate . . . or by a Developer Borrower."[182] The Defendants further contend that Plaintiffs cannot allege injuries stemming from guaranty agreements that have not yet matured and that the allegations of loss suffered by UDF III generally involve only a risk of loss or inference of loss.[183] Defendants also assert that Plaintiffs failed to allege how the Limited Partners suffered tangible injury as a result of UDF III's failure to file quarterly and annual reports with the SEC.[184]

Plaintiffs respond they have provided factual allegations evidencing the "systematic collapse and financial devastation of UDF III"[185] and that "[UDF III's] failure to distribute financial statements have prevented Plaintiffs and other limited partners from making informed decisions on their investment in UDF III, the calculation of damage for which can be later determined by the Court."[186] Plaintiffs argue, "The total damages to UDF III, the Plaintiffs and Limited Partners

---

[182] Entity Defs.' Opening Br. 46.

[183] *Id.* at 46.

[184] *Id.* at 47.

[185] Pls.' Ans. Br. 59. *See also* SAC ¶¶ 119-20 (alleging that the "guaranty amounts pursuant to these agreements . . . expos[ed] UDF III to the risk of massive losses for which UDF III was receiving inadequate consideration.")

[186] Pls.' Ans. 59, n.30.

cannot currently be determined because the Fiduciary Defendants have failed to file with the SEC, or to publicly disclose any quarterly or annual report, or audited or unaudited financial statement, for UDF III since November 16, 2015 . . . ."[187]

Damages can be pleaded generally. *See Bamford v. Penfold, L.P.*, 2020 WL 967942, at *21 (Del. Ch. Feb. 28, 2020). "Proof of . . . damages and of their certainty need not be offered in the complaint in order to state a claim." *Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 156 (Del. Ch. 2003). Plaintiffs' fiduciary duty claims are based on a breach of the duty of loyalty. "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly." *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996); *see also Encite LLC v. Soni*, 2011 WL 5920896, at *25 (Del. Ch. Nov. 28, 2011) ("Where this Court finds that a breach of fiduciary duty has occurred, the specificity and amount of evidence required from the Plaintiff on the issue of damages is minimal.").

Plaintiffs have pleaded sufficient injury to survive a motion to dismiss. First, Plaintiffs identified that UDF III forgave $122 million of indebtedness to Buffington Land, and that UDF III acknowledged this loan forgiveness may have a "material adverse impact on UDF III's financial statements."[188]  Second, Plaintiffs

---

[187] SAC ¶ 19; *see also* Pls.' Ans. Br. 59.

[188] SAC ¶¶ 84, 218-20.

have alleged other loans are also uncollectible because CTMGT, UDF I, and UDF X are insolvent.[189] This includes the UMT Loan, in which UDF III exercised its UMT Participation Interest, the UMT NP Loan, and the UDF X Loan[190] Third, Plaintiffs have alleged that UDF III paid over $7.6 million in mortgage servicing fees to UMTH LD through September 2015 for an inflated loan balance because Defendants knew or should have known that many of the loans in UDF III's loan portfolio were materially impaired.[191] Plaintiffs seek to recover the fees and profits that Defendants obtained as a result of their breaches of fiduciary duty. At this stage, Plaintiffs' allegations of injury are sufficient to state a claim.

4. **Counts I and II Allege Breaches of Fiduciary Duty as to UMTH LD, UMT Services, Etter, Greenlaw, Wilson, and Wissink.**

Count I is a derivative claim against UMTH LD, UMT Services, Etter, Greenlaw, Wilson, Obert, Wissink, and Youngblood for breach of fiduciary duty. Count II is asserted as a direct claim for breach of fiduciary duty.

"A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010), *aff'd*, 11 A.3d 749 (Del.

---

[189] *Id.* ¶¶ 241-43. To the extent Plaintiffs are asserting a claim as to the loan extended to Shahan Prairie, *see id.* ¶¶ 129-34, Plaintiffs admit that the loan was repaid in full and have not adequately alleged damages as to that transaction. *See infra* n.259.

[190] Entity Defs.' Opening Br. 44-45.

[191] SAC ¶¶ 257-59.

47

2010).  The Defendants argue that the Individual Defendants do not owe fiduciary duties to UDF III or its Limited Partners, and even if they do, the Plaintiffs have not alleged a breach of duty as to several of their claims.

### a.  *USACafes* and *Stare Decisis*

The Individual Defendants contend the managers and directors of the corporate General Partner should not be held to owe fiduciary duties to the Partnership or the Limited Partners.  The Individual Defendants acknowledge that in *USACafes*, then-Chancellor Allen held that directors and controllers of a corporate general partner owed fiduciary duties to the limited partnership and the limited partners.[192]  The Individual Defendants recognize that *USACafes* has been ensconced in Delaware alternative entity law for nearly three decades.[193]  Nevertheless, they argue that "*USACafes* was wrongly decided and, more importantly, presents an irreconcilable conflict with current Delaware law regarding alternative entities."[194]

*Stare decisis* ("to stand by things decided") is the legal term for fidelity to precedent. *Black's Law Dictionary* 1696 (11th ed. 2019).[195]  The doctrine "finds ready application in Delaware corporate law."  *Leonard Loventhal Account v.*

---

[192] Individual Defs.' Opening Br. 9-10, Dkt. 124 (citing *USACafes*, 600 A.2d at 48-49).

[193] *Id.*

[194] *Id.* at 30.

[195] For a recent discussion of *stare decisis*, *see June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2134 (2020) (Roberts, C.J. concurring).

*Hilton Hotels Corp.*, 780 A.2d 245, 248 (Del. 2001). "It is axiomatic . . . that once a trial judge decides an issue, other trial judges on that court are entitled to rely on that decision as *stare decisis.*" *Gatz Properties, LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1209 (Del. 2012); *see also Leonard Loventhal Account v. Hilton Hotels Corp.*, 2000 WL 1528909, at *5 (Del. Ch. Oct. 10, 2000) (observing that the doctrine of *stare decisis* is applicable to "a decision of a court higher in rank, or of the same rank" (quoting 20 Am. Jur. Courts § 201 (1965)), *aff'd*, 780 A.2d 245 (Del. 2001).

This Court has "followed *USACafes* consistently." *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 671 (Del. Ch. 2012). While the contours of the fiduciary obligations have been debated, it is well established that, at a minimum, the individuals and entities that own and control the general partner owe the limited partners "the duty not to use control over the partnership's property to advantage the corporate director at the expense of the partnership." *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *10 (Del. Ch. Apr. 20, 2009); *accord Feeley*, 62 A.3d at 671; *see generally* Martin I. Lubaroff *et al.*, *Lubaroff & Altman on Delaware Limited Partnerships* § 14.01[C], at 14-19 (2d ed. 2020) ("*USACafes, L.P.* does not fully define the scope of a common law fiduciary duty of a director of a corporate general partner to a limited partnership and to its limited partners."). Corporate practitioners and drafters of alternative entity

49

agreements are well advised of this precedent and the importance of it when drafting alternative entity agreements. *See*, *e.g.*, Lubaroff § 14.01[C], at 14-19; IV Robert S. Saunders *et al.*, *Folk on the Delaware Corporation Law* § 17-403.05[H] (6th ed. 2020).

Controllers may avoid or at least minimize the duty that *USACafes* recognized by structuring their limited partnership agreements to eliminate fiduciary duties. Delaware limited partnership jurisprudence has long recognized broad license to limit fiduciary duty protections in limited partnership agreements. *See Sonet v. Plum Creek Timber Co., L.P.*, 722 A.2d 319, 322 (Del. Ch. 1998). In a 2004 amendment to the Delaware Revised Uniform Partnership Act (the "LP Act"), Section 17-1101(d) clarified that the drafters of limited partnership agreements may eliminate duties, including fiduciary duties, owed by "a partner or other person . . . to a limited partnership or to another partner or to another person that is a party to or is otherwise bound by a partnership agreement." 6 *Del. C.* § 17-1101(d). In the same amendment, Section 17-1101(f) clarified that the limited partnership agreement may provide for the limitation or elimination of liabilities for breach of fiduciary duty.

The Individual Defendants' request for this Court to reject *USACafes* is a tall order indeed. To depart from *USACafes* would require the Court to ignore that creators of Delaware limited liability companies have drafted their agreements

50

with full knowledge of the *USACafes* holding as well as the ability of the drafters of their agreements to limit or eliminate fiduciary duties. *See* Lubaroff, § 14.01[C], at 14-19 (discussing *USACafes* and "recommend[ing] that the duties (including fiduciary duties) of such persons to a limited partnership and to the partners of such partnership and to other persons that are parties to or are otherwise bound by a partnership agreement to be defined in the partnership agreement in accordance with Section 17-1101(d)"); *id*. at 14-15 ("The best way to protect an affiliate of a general partner of a limited partnership is by drafting into a partnership agreement the desired standard by which such persons or entities are to be judged.").

Some partnership agreements have eliminated fiduciary duties;[196] others have not. The Defendants here did not, but that was a conscious decision on their part. To be sure, UDF III was formed in 2005, one year after the 2004 amendments to Section 17-1101(d) and 17-1101(f) of the LP Act. The Individual Defendants have not shown that *USACafes* reflects "a clear manifestation of error"

---

[196] *See*, *e.g.*, *Hite Hedge LP v. El Paso Corp.*, 2012 WL 4788658, at *3 (Del. Ch. Oct. 9, 2012) (granting motion to dismiss where partnership agreement eliminated fiduciary duties); *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 186 (Del. Ch. 2014) (limited partnership agreement eliminated all fiduciary duties); *In re Kinder Morgan, Inc. Corp. Reorganization Litig.*, 2015 WL 4975270, at *5 (Del. Ch. Aug. 20, 2015) (granting motion to dismiss where limited partnership agreement eliminated fiduciary duties); *Inter-Marketing Gp. USA, Inc. v. Armstrong*, 2019 WL 417849, at *5-6 (Del. Ch. Jan. 31, 2019) (holding plaintiffs did not establish demand futility where limited partnership agreement eliminated fiduciary duties).

or that there are "urgent reasons" for this Court to abandon its holding. *Loventhal*, 789 A.2d at 248. If *USACafes* is to be jettisoned, that is a determination for the Delaware Supreme Court. *Feeley*, 62 A.3d at 671.

### b. The Complaint Adequately Alleges that UMT Services, Etter, Greenlaw, Wilson, and Wissink Owe Fiduciary Duties.

The Partnership Agreement does not eliminate or limit fiduciary duties owed by UMTH LD or any other person. Therefore, UMTH LD owes fiduciary duties to UDF III as its general partner. *Feeley*, 62 A.3d at 662 ("General partners owe default fiduciary duties."). Defendants do not dispute that UMTH LD and UMT Services owe fiduciary duties to UDF III and its Limited Partners.[197]

Pursuant to *USACafes* and its progeny, the "individuals and entities who control the general partner owe to the limited partners at a minimum the duty of loyalty." *Feeley*, 62 A.3d at 670. Defendants concede that if *USACafes* applies, Etter, Greenlaw, and Wilson also owe fiduciary duties to UDF III and its Limited Partners.[198] The Individual Defendants contend, however, that even under *USACafes*, Wissink, Obert, and Youngblood do not owe fiduciary duties because those Individual Defendants are not alleged to exert sufficient control over the

---

[197] Entity Defs.' Reply Br. 42.

[198] *See* Individual Defs.' Reply Br. 21-26, Dkt. 136.

assets of UDF III.[199] "[T]o have any fiduciary duties to an entity, the affiliate must exert control over the assets of that entity." *Bay Ctr. Apartments*, 2009 WL 1124451, at *9 (citing *Wallace v. Wood*, 752 A.2d 1175, 1118 (Del. Ch. 1999) ("Officers, affiliates and parents of a general partner, may owe fiduciary duties to limited partners if [they] control the partnership's property.")).

Wissink is the president and former chief operating officer of UMTH LD and one of three voting members of UMTH LD's investment committee (Etter and Greenlaw being the other two).[200] Wissink is further alleged to have participated in all investment, loan underwriting, and impairment decisions on behalf of UDF III, including the challenged transactions.[201] Specifically, by March 2014, UDF III allegedly knew that "full collectability from [Buffington Land] was not probable and, at best, highly uncertain[,]" yet the investment committee continued to extend the maturity date and increase the loan to Buffington Land.[202] Wissink also personally executed the agreements on behalf of UDF III for the UMT Participation Loan, the UMT Loan Option, and the UDF X Loan.[203] Those allegations are enough at the pleading stage to support a reasonable inference that

---

[199] *Id.*

[200] SAC ¶ 34.

[201] *Id.* ¶ 34; SEC Compl. ¶¶ 11-13, 46.

[202] SAC ¶ 136 (quoting the SEC Complaint).

[203] *Id.* ¶ 162.

Wissink exercised sufficient "control" along with Etter, Greenlaw, and Wilson over the assets of UDF III to justify the imposition of fiduciary duties on him.

Obert and Youngblood are senior officers of UMTH LD, but there are no specific allegations that either individual exerted actual control over UDF III's assets. UDF III's public filings disclosed that UDF III's "success depends to a significant degree on the diligence, experience and skill of certain executive officers and other certain key personnel of our general partner, including . . . Youngblood and . . . Obert."[204] Those allegations are not sufficient to establish a reasonable pleading stage inference that Obert and Youngblood exercised sufficient "control" over the assets of UDF III to justify the imposition of fiduciary duties on them. *See Lewis v. AimCo Properties, L.P.*, 2015 WL 557995 (Del. Ch. Feb. 10, 2015) (allegations that an individual holds officer positions in affiliated entities and that the individual made some public statements on behalf of the limited partnership, without more, are not enough to show that the individual exercised control of the relevant defendant entities).

The Court concludes that UMTH LD, UMT Services, Etter, Greenlaw, Wilson, and Wissink owe fiduciary duties to UDF III and the Limited Partners. Accordingly, Counts I and II are dismissed as to Obert and Youngblood only. For

---

[204] *Id.* ¶ 161.

the remainder of this Opinion, UMTH LD, UMT Services, Etter, Greenlaw, Wilson, and Wissink are collectively referred to as the "Fiduciary Defendants."

### c. The Complaint Fails to Allege a Direct Breach of Fiduciary Duty for the Failure to Distribute Cash Available for Distribution.

Count II alleges that the Fiduciary Defendants breached their fiduciary duties by their failure to cause UDF III to distribute Cash Available for Distribution from January 2016 to the present. Count II also alleges the Fiduciary Defendants breached their fiduciary duties by omitting and misstating material information provided to the Limited Partners concerning UDF III and its assets.[205] Defendants argue that Count II must be dismissed for failure to state a claim as to these two allegations.

Section 9.1 of the Partnership Agreement provides that "Cash Available for Distribution for each applicable accounting period shall be distributed (a) 90% to the Limited Partners and the General Partner . . . and (b) 10% to the General Partner."[206] Section 3.13 defines "Cash Available for Distribution" as "cash funds received by the Partnership from operations . . . , including, without limitation, interest, points or dividends from interim investments and proceeds from borrowings, if any, less all cash used to pay [UDF III's] expenses and debt

---

[205] SAC ¶ 366.

[206] Partnership Agreement § 9.1.

payments and amounts set aside for reserves."[207]   Defendants argue that the Partnership Agreement provides the General Partner with absolute discretion to maintain cash reserves, which are excluded from the Cash Available for Distribution.[208]   Therefore, Defendants argue, the decision to maintain cash reserves and cease distributions was a valid exercise of business judgment.[209] Defendants also argue that Plaintiffs do not allege that there was, in fact, Cash Available for Distribution.  The Individual Defendants argue that Count II is not a fiduciary duty claim, but rather a claim for breach of contract and that the General Partner, which among the Defendants is the only party to the LPA, is the only one with potential liability.

Plaintiffs contend, however, that even if the General Partner has absolute discretion to determine reserves, it does not supplant the General Partner's duty to act loyally in exercising that discretion.[210]  Plaintiffs also argue that this claim is a distinct from the breach of contract claim because it relies on additional facts. Plaintiffs claim that the fiduciary decision to preserve cash was made to allow the Fiduciary Defendants "to fund their own special interests at the unfair expense of

---

[207] *Id.* § 3.13.

[208] Entity Defs.' Opening Br. 49.

[209] Entity Defs.' Reply Br. 44.

[210] Pls.' Ans. Br. 95-96 (citing *Paige Capital Mgm't, LLC v. Lerner Master Fund, LLC*, 2011 WL 3505355 at *32 (Del. Ch. Aug. 8, 2011).

the limited partners."[211] Plaintiffs specifically point to paragraphs 151, 181, and 183 of the Complaint for allegations that "the Fiduciary Defendants continued to cause the Partnership to make loan advancements to Buffington Land after January 2016."[212] But, as Defendants note, none of those paragraphs alleges any loan advancements to Buffington Land after January 2016. At minimum, Plaintiffs contend their allegations are sufficient to rebut the business judgment rule.[213]

The Complaint does not allege facts sufficient to create a reasonable inference that there was Cash Available for Distributions or that distributions were ceased and cash preserved starting in January 2016 to fund the Fiduciary Defendants' own special interests. Accordingly this portion of Count II is dismissed for failure to state a claim.

Count II also alleges the Fiduciary Defendants breached their fiduciary duties by omitting and misstating material information provided to the Limited Partners concerning the Partnership and its assets.[214] Count II purports to allege a direct fiduciary duty claim for two types of communications or omissions. The first is in the context of a request for stockholder action concerning the November 9, 2015 letter dissuading UDF III Limited Partners from tendering into a mini-

---

[211] Pls.' Ans. Br. 94.

[212] *Id.*

[213] *See id.* at 96.

[214] SAC ¶ 366.

57

tender offer. The second is in the context of providing false or materially misleading communications about the Partnership's operations in general. The first category falls within the duties of care and loyalty and is referred to as a "fiduciary duty of disclosure." *Dohmen v. Goodman*, 2020 WL 3428213, at *4 (Del. June 23, 2020) (noting that communications concerning investment decisions such as tendering stock is a request for stockholder action). In that circumstance, a stockholder alleging a breach of the duty of disclosure need not allege damages. *Id*. ("In this context, we have characterized a fiduciary's damages liability as 'per se.'").

The second category concerns communications not associated with stockholder action, "such as when directors make periodic financial disclosures required by securities laws." *Id*. In this context, the "fiduciary duty of disclosure" is not implicated; nevertheless, under the duties of care and loyalty, "the directors must deal honestly with stockholders." *Id*. To state a claim in this context, the directors must have knowingly disclosed false information. In addition, damages is an element of the claim. *Id*. This type of claim is also considered derivative. *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 990 (Del. Ch. 2007).

In their opening brief, the Entity Defendants argued that the claims concerning alleged omissions and misrepresentations in Count II should be

dismissed for failure to allege injury.[215]   The portion of Count II concerning the

November 9, 2015 letter to Limited Partners implicates the fiduciary duty of

disclosure.   The Entity Defendants' argument that this claim fails for failure to

allege damages fails, because damages is not an element that Plaintiffs are required

to plead.   *Dohmen*, 2020 WL 3428213, at *4.[216]   Accordingly, this portion of

Count II states a disclosure claim.[217]

The remaining claims in Count II concerning communications to Limited

Partners do not involve a request for stockholder action.   Plaintiffs allege that the

Defendants purposefully misled the Limited Partners by concealing information

concerning the Partnership and its assets.   Plaintiffs also allege that UDF III's

public filings misled the Limited Partners to believe that UDF III's distributions

---

[215] Entity Defs.' Opening Br. 50.  In their opening brief, the Individual Defendants argued that if the Court holds that any of the Individual Defendants are held to owe fiduciary duties under *USACafes*, then Count II should be dismissed for failure to rebut the business judgment rule, referring to an argument in the Entity Defendants' opening brief. Individual Defs.' Opening Br. 32.  But that argument section of the brief does not address the disclosure claim.

[216] In a footnote in their reply brief, the Entity Defendants argued that the claim should be dismissed because plaintiffs have not adequately alleged that the "representations [in the letter] were actually false at the time they were made."  Entity Defs.' Reply Br. 30 n.8. The Court does not consider this argument as it was not fairly raised in the opening brief, nor does the legal standard governing the duty of disclosure require that the representation be false to state a claim.  *See Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992) (recognizing a fiduciary duty to "disclose fully and fairly all material information within the board's control when it seeks shareholder action"); *Gantler v. Stephens*, 965 A.2d 695, 710 (Del. 2009) ("The essential inquiry [in a fiduciary duty of disclosure claim] is whether the alleged omission or misrepresentation is material.").

[217] The parties have not briefed the issue of whether the disclosure claim implicates the duties owed by the individual Fiduciary Defendants under *USACafes*.

59

were being paid through operations of the Partnership, when in fact they were being paid through transfers from UDF IV.[218] These derivative claims require a plaintiff to plead knowingly false disclosure and damages. *Dohmen*, 2020 WL 3428213, at *4. In their brief, the only specific allegation they point to is paragraph 288 of the Complaint, which concerns the allegations pertaining to the November 9, 2015 letter, which relates to the direct disclosure claim, not the derivative claim.[219] Accordingly, the derivative portion of the claims in Count II is dismissed for failure to state a claim.

### 5. Count III Fails to Allege a Derivative Claim for Waste.

Count III asserts a derivative claim on behalf of UDF III against UMTH LD for waste.[220] Defendants argue that Plaintiffs have failed to meet the high standard for pleading a claim for corporate waste. For a waste claim to survive a motion to dismiss, a plaintiff must show "economic terms so one-sided as to create an inference that no person acting in a good faith pursuit of the corporation's interests

---

[218] SAC ¶ 150 ("UDF III investors were led to believe that their distributions were being paid from the operation of their fund. . . . UDF III investors would have considered it important when making an investment decision that the true source of a portion of their received distributions were not actually coming from funds from operations as disclosed in UDF III's filings . . . but instead were the results of transfer from UDF IV." (quoting SEC Compl. ¶¶ 32, 34)).

[219] *See* Pls.' Ans. Br. 96-97.

[220] Plaintiffs originally asserted this claim against UMTH LD, UMT Services, and all of the Individual Defendants. In response to arguments in the Individual Defendants' briefs, Plaintiffs dropped their claim for waste against all Defendants except UMTH LD. Pls.' Ans. Br. 98, n.61.

could have approved the terms." *Sample v. Morgan*, 914 A.2d 647, 670 (Del. Ch. 2007); *see also Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 192 (Del. Ch. 2014) (same). "The pleading burden on a plaintiff attacking a corporate transaction as wasteful is necessarily higher than that of a plaintiff challenging a transaction as 'unfair' as a result of the directors' conflicted loyalties . . . ." *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 892 (Del. Ch. 1999). As a result, a "claim for waste will arise only in the rare, unconscionable case where directors irrationally squander or give away corporate assets." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 74 (Del. 2006).

The Complaint falls short of the high standard to plead a claim for waste of partnership assets. The challenged transactions fail to show economic terms "so one-sided" that they are "unconscionable." For example, extending the maturity date and accepting assignments for some of the challenged loans rather than writing them off would not be unconscionable if it increased the likelihood that they would be repaid. Furthermore, Plaintiffs do not allege facts to show that the Partnership received no consideration for the challenged loans and transactions. Accordingly, Plaintiffs have failed to state a claim for waste of partnership assets.

### 6. Count IV States a Claim for Aiding and Abetting a Breach of Fiduciary Duty.

Count IV alleges UMT, UMT Holdings, UMTH General, UDF I, UDF IV, and UDF X aided and abetted the Fiduciary Defendants' breaches of fiduciary

duties. Under Delaware law, a person or entity that knowingly and substantially participates in a breach of fiduciary duty is jointly and severally liable with the fiduciary for the breach. *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 872 (Del. 2015). To state a claim for aiding and abetting, a plaintiff must allege "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *Malpiede*, 780 A.2d at 1096 (internal quotations omitted).

The Defendants that are the subject of this claim challenge Count IV only on the premise that Plaintiffs are precluded from bringing claims based on interested transactions disclosed in UDF III's public filings and Partnership Agreement. As discussed *supra* Section II(A)(2), the Court rejects Defendants' arguments on that issue. Accordingly, the motion to dismiss Count IV is denied.

> **7.    Count V Fails to Allege a Derivative Claim for Breaches of Sections 11.3(b) and 13.3, but States a Claim for Breach of Section 11.3(c).**

"[T]o survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of the obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). Moreover, "[a]n allegation, though

vague or lacking in detail, is nevertheless 'well-pleaded' if it puts the opposing party on notice of the claim being brought against it."  *VLIW Tech.*, 840 A.2d at 611.

Counts V asserts a derivative claim on behalf of UDF III that UMTH LD breached the Partnership Agreement: (1) by causing UDF III to concentrate assets "to or from any one borrower that would exceed, in the aggregate, an amount greater than 20% of the Offering Proceeds" in violation of Section 11.3(b);[221] and (2) by failing to obtain the appraisals in connection with the UMT Participation Interest and UMT Option in violation of Sections 11.3(c) and 13.3.[222]  The Defendants argue that Count V must be dismissed because the Complaint fails to plead that UMTH LD violated the express terms of the Partnership Agreement.[223]

Section 11.3(b) of the Partnership Agreement prohibits the General Partner from causing the Partnership to "invest in or make mortgage loans to or from *any*

---

[221] SAC ¶¶ 172-86, 379-80.

[222] *Id.* ¶ 381.

[223] In the opening brief, the Entity Defendants also argue that Count V, a derivative breach of contract claim on behalf of UDF III, must be dismissed because UDF III is not a party to the Partnership Agreement.  Entity Defs.' Opening Br. 50-51.  The Defendants do not appear to defend this argument in their reply brief, and it fails as a matter of law.  Section 17-101(4) of the LP Act provides that the "limited partnership is bound by its partnership agreement whether or not the limited partnership executes the partnership agreement."  6 *Del. C.* § 17-101(14).  By binding UDF III to the Partnership Agreement, Section 17-101(14) makes it a party to the Partnership Agreement and therefore can enforce the Partnership Agreement.  *See Seaport Vill. Ltd. v. Seaport Vill. Operating Co., LLC*, 2014 WL 4782817, at *2 (Del. Ch. Sept. 24, 2014) (holding that under the parallel provision of the LLC Act, an LLC is a party to its operating agreement and therefore can enforce that agreement's fee-shifting provision against another party to that agreement).

*one borrower* that would exceed, in the aggregate, an amount greater than 20% of the Offering proceeds."[224]   The Complaint alleges that UMTH LD breached Section 11.3(b) when it concentrated more than 20% of UDF III's offering proceeds in loans to UDF I, Buffington Land, and CTMGT.[225]   The obvious flaw in this claim is that Plaintiffs consolidated the loans of each of UDF I, Buffington Land, and CTMGT's affiliated entities to allege a breach of the 20% concentration limit.[226]

Plaintiffs argue that the Court should allow consolidation at the pleading stage because Section 11.3(b) is designed to "protect[] the Partnership from overexposure of its assets to the credit risk of any entity."[227]   In the alternative, Plaintiffs argue that this Court should find Section 11.3(b) ambiguous as to whether it allows such consolidation.[228]

Section 11.3(b) prohibits the Partnership from making loans "to or from any one borrower that would exceed, in the aggregate, an amount greater than 20% of

---

[224] Partnership Agreement § 11.3(b) (emphasis added).

[225] SAC ¶¶ 172-86, *see also* Pls.' Ans. Br. 100.

[226] *Compare, e.g.*, SAC ¶ 168 (alleging that CTMGT comprised 31% of the outstanding loan balance of UDF III's portfolio), *with* Entity Defs.' Opening Br., Ex. O (promissory note to CTMGT and its subsidiaries as co-borrowers).

[227] Pls.' Ans. Br. 102.

[228] *Id.* 103.

the Offering Proceeds."[229]   The language of Section 11.3(b) is unambiguous. "One" means "a single person or thing." *Merriam Webster's Collegiate Dictionary* 812 (10th ed. 1997).   Delaware courts construe contract terms according to their plain meaning. *Parker v. Barley Mill House Assocs., L.P.*, 38 A.3d 1255, at \*2 (Del. 2012) (TABLE).  Plaintiffs have not shown an adequate reason for this Court to ignore the plain meaning of the Partnership Agreement or to disregard the separate and distinct legal identities of affiliates of UDF I, Buffington Land, CTMGT, and their respective subsidiaries and affiliates when applying this provision of the contract.

Plaintiffs also argue that the 20% loan concentration limit in Section 11.3(b) was breached solely as to loans to UDF I.[230]   Plaintiffs allege that UDF III concentrated more than 20% of UDF III's offering proceeds in UDF I as a single borrower through the UMT Participation Interest and the 2006 UDF I Loan.[231] This argument fails for the same reason discussed above.  The allegations of the Complaint refer to loans to "UDF I and its subsidiaries" and "lending to UDF I and its affiliates" as exceeding the 20% threshold.[232]  Plaintiffs have cited no facts to support an argument that subsidiaries and affiliates comprise one borrower.  Nor

---

[229] Partnership Agreement § 11.3(b).

[230] Pls.' Ans. Br. 103.

[231] SAC ¶ 176.

[232] *Id.* ¶¶ 176-79.

do they offer legal argument to support that theory for purposes of applying this provision of the contract.

Plaintiffs next allege that UMTH LD breached Sections 11.3(c) and 13.3 of the Partnership Agreement by failing to "obtain the required appraisals of the properties and collateral supposedly supporting the UMT Loan."[233] Defendants argue that Section 11.3(c) does not require UDF III to independently obtain appraisals; it requires only that any loans be supported by "an appraisal of the property which secures the loan," whether that appraisal was obtained by UDF III or by another lender.[234] That may be so, but Plaintiffs have alleged that the Partnership "did not [ ] obtain any appraisals of the collateral or other assurance that the loan was properly secured."[235] On the low pleading threshold on a motion to dismiss, this supports an inference that there were no appraisals of the properties supporting the UMT Loan from any source. Accordingly, this claim cannot be

---

[233] *Id.* ¶¶ 187-89.

[234] Entity Defs.' Opening Br. 64.

[235] SAC ¶ 189.

66

dismissed.[236]   Therefore, Plaintiffs have stated a claim for a breach of Section 11.3(c).

Section 13.3 requires that loans made to affiliates of UMTH LD be supported by a fairness opinion from an independent advisor.[237]   The Entity Defendants' Opening Brief attached UDF III's Form 10-Q for the period ended September 30, 2015 (which is also incorporated by reference into the Complaint), which expressly states that UDF III "obtained an opinion from Jackson Claborn stating that the transactions are fair and at least as reasonable to the Partnership as a transaction with an unaffiliated party in similar circumstances."[238]   Plaintiffs made no argument on this issue in their Answering Brief, and the Court concludes that Plaintiffs have abandoned this claim. *See Emerald P'rs*, 726 A.2d at 1224 ("Issues not briefed are deemed waived.").   Accordingly, Plaintiffs' claim for breach of Section 13.3 is dismissed.  Count V is dismissed, except for the breach of contract claim relating to Section 11.3(c).

---

[236] Plaintiffs argue that even if an appraisal is obtained by another entity, Section 11.3(c) requires that UDF III maintain that appraisal in its records. Pls.' Ans. Br. 104.  Plaintiffs, however, have not pleaded that the appraisal is not in UDF III's records.  This new assertion only surfaced in Plaintiffs' Answering Brief.  Because the claim is not being dismissed, the Court need not address this late-blooming assertion.  Nevertheless, Plaintiffs have not alleged how the mere failure to maintain an appraisal in the Partnership's records could give rise to any damages.

[237] SAC ¶ 188; Partnership Agreement § 13.3(a)(ii).

[238] Defs.' Opening Br., Ex. O.  The Court does not take judicial notice of the truth of this representation in the SEC filing, but notes it to plausibly explain why Plaintiffs appear to have abandoned this claim.

### 8. Count VI Alleges a Direct Breach of Contract Claim.

Count VI asserts a direct claim that UMTH LD breached the Partnership Agreement: (1) by causing UDF III to cease distributions of the Cash Available for Distribution;[239] and (2) by causing UDF III to cease distributions of financial reports for UDF III.[240] Plaintiffs argue that Count VI fails to state a claim because the Complaint does not allege that there was any Cash Available for Distribution, and that Count VI should be dismissed for laches[241] and a failure to plead injury or damages resulting from any purported breach.[242]

As explained earlier, Plaintiffs have not stated a claim for breach of fiduciary duty for ceasing distributions of Cash Available for Distribution. The same reasoning is applicable here. Plaintiffs have not alleged that UDF III in fact has any Cash Available for Distribution in UDF III and, accordingly, have failed to plead a breach of Section 9.1 of the Partnership Agreement.

Section 15.2 of the Partnership Agreement states that the "General Partner shall prepare or caused to be prepared" numerous reports, including required quarterly and annual reports to be filed with the SEC,[243] as well as an annual report

---

[239] SAC ¶ 385.

[240] *Id.*

[241] The Court has already resolved which transactions are not barred by laches. *See supra* Section II(A)(1).

[242] Entity Defs.' Reply Br. 53.

[243] Partnership Agreement §§ 15.2(c), (d), (g), (h).

containing financial statements and a report of activities of the Partnership for the year to be sent to the Limited Partners.[244] In addition, "[t]he General Partner shall furnish each Limited Partner an annual statement of estimated Unit value."[245] Plaintiffs allege that the General Partner has not provided these reports since 2015.[246] Defendants' only argument is that Plaintiffs have not alleged damages, relying upon *Villare v. Beebe Med. Ctr., Inc.*, 2014 WL 1095331, at *4 (Del. Super. Mar. 19, 2014). *Villare* is inapposite. *Villare* was a decision on summary judgment where the court held there was no contract and even if there were, the plaintiff could not establish its lost profits theory of damages because the plaintiff did not have an expert. Here, the Court concludes that Plaintiffs have met their minimal burden of alleging injury. Furthermore, Plaintiffs have requested equitable relief, which could be available to enforce their information rights. Accordingly, the motion to dismiss is granted in part and denied in part as to Count VI.

### 9. The Complaint States a Claim for Unjust Enrichment.

Count VII alleges that, "[b]y their wrongful acts and omissions, each Defendant was unjustly enriched at the expense of and to the detriment of UDF

---

[244] *Id.* § 15.2(b).

[245] *Id.* § 15.2(f).

[246] SAC ¶¶ 264-267, 385.

69

III."[247]    Plaintiffs assert that the Fiduciary Defendants were unjustly enriched through their breach of fiduciary duty, while the remaining Defendants knowingly participated in and unjustly benefited from those breaches.[248]    The Entity Defendants argue the unjust enrichment claim must be dismissed because the parties' relationship is governed by contract, which precludes an unjust enrichment claim.  They also argue Plaintiffs fail to specify a direct relationship between the challenged transactions and any benefit to several of the Entity Defendants.[249] Wissink, Obert, and Youngblood separately move to dismiss the unjust enrichment claim on the grounds that it is premised upon the breach of a fiduciary duty that they do not owe.[250]

Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."  *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).  The elements of unjust enrichment are: (i) an enrichment, (ii) an impoverishment, (iii) a relation between the enrichment and impoverishment, (iv) the absence of justification, and (v) the absence of a remedy provided by law. *Id.*; *Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999).

---

[247] *Id.* ¶ 388.

[248] *Id.* ¶ 390.

[249] Entity Defs.' Opening Br. 55-56.

[250] Individual Defs.' Opening Br. 40-41.

70

Courts developed unjust enrichment as a theory of recovery to remedy the absence of a formal contract. *ID Biomedical Corp. v. TM Tech., Inc.*, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995).

In evaluating the unjust enrichment claim, the Court must first determine whether a contract governs the parties' relationship. "If a contract comprehensively governs the parties' relationship, then it alone must provide the measure of the plaintiff's rights, and any claim of unjust enrichment will be denied." *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *27 (Del. Ch. Nov. 26, 2014) (internal quotations omitted). "[T]his Court routinely dismisses unjust enrichment claims that are premised on an 'express, enforceable contract that controls the parties' relationship' because damages is an available remedy at law for breach of contract." *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *19 (Del. Ch. Sept. 18, 2014) (quoting *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009)). Furthermore, the Plaintiffs cannot use "a claim for unjust enrichment to extend the obligations of a contract to [persons] who are not parties to the contract." *Kuroda*, 971 A.2d at 892.

Plaintiffs argue the relationship here is governed not only by contract, but "is also governed by common law fiduciary duties" and that the unjust profits are the

result of breaches of fiduciary duty.[251] Plaintiffs also assert that the unjust enrichment claim is an alternative to damages for breach of fiduciary duty.[252]

The essence of the unjust enrichment claim is that the Fiduciary Defendants breached their fiduciary duties through the challenged loan transactions to affiliated UDF funds or the Developer Borrowers and were unjustly enriched— directly or indirectly—through additional fees and increased value of their subordinated profits interests in UDF I and UDF II.[253]

Based upon the allegations in the Complaint and the parties' briefing, the parties have not sufficiently joined issue on whether each of the challenged transactions are governed by a contract that comprehensively governs the relationship among UDF III and the Entity Defendants. The Entity Defendants seemingly rely on *Vichi v. Koninklijke Philips Electronics N.V.*, 62 A.3d 26 (Del. Ch. 2012), for the proposition that Plaintiffs do not allege a direct relationship between UDF III's loans to affiliates and non-parties and any corresponding benefit to UMT, UMT Holdings and UMTH General.[254] *Vichi* was a decision on summary judgment, not a motion to dismiss where the pleading standard is much lower. In *Vichi*, the plaintiff sought to hold a non-party to the contract liable for

---

[251] Pls.' Ans. Br. 106.

[252] *Id.*

[253] SAC ¶¶ 150, 316, 326, 334, 340.

[254] Entity Defs.' Opening Br. 56; Entity Defs.' Reply Br. 54.

the counter-party's breach. The Court granted summary judgment for the non-contracting defendant because a contract governed the relationship and the plaintiff could not use unjust enrichment to hold a non-contracting party liable. The Court also rejected plaintiff's argument that the loan directly benefited the non-contracting party through reduced investment risk and enhanced reputational benefits. *Id.* at 60-61. Unlike in *Vichi*, the Plaintiffs here have alleged facts to support more than a reasonable inference that the benefits obtained were financial and direct. Accordingly, the Court cannot determine, as a matter of law, that any of the unjust enrichment claims should be dismissed solely on the grounds that relationships were comprehensively governed by contract.

As to the other grounds for dismissal, the Court concludes that the claim for unjust enrichment must be dismissed as to UMT Services and UMT. Plaintiffs specifically pointed to paragraphs 150, 316, 326, 330, 334, and 340 of the Complaint as allegations showing "unjust profits obtained" by several of the Entity Defendants as a result of the Partnership's lending. But those paragraphs do not allege facts to support a reasonable inference that UMT Services or UMT were unjustly enriched. Therefore, Count VII is dismissed as to those two Defendants.

At this stage, the Court cannot dismiss the unjust enrichment claims as to the Individual Defendants. It is unlikely that those who have been determined to owe fiduciary duties—UMTH LD, UMT Services, Greenlaw, Etter, Wilson, and

73

Wissink—"could be liable for unjust enrichment under circumstances when they would not also be liable for a breach of fiduciary duty." *Frederick Hsu Living Trust v. ODN Hldg. Corp.*, 2017 WL 1437308, at \*43 (Del. Ch. Apr. 14, 2017). Yet it is possible that they could have a defense to fiduciary duty liability but the profits they received could have resulted from a fiduciary breach. *Id.* Under those circumstances, the unjust enrichment claim could be a vehicle for the Partnership's recovery. *Id.* That same rationale supports the Plaintiffs' unjust enrichment claims against Obert and Youngblood. Although the Court has concluded that they do not owe fiduciary duties, the Plaintiffs may be able to show that the profits they are alleged to have obtained are without justification.

## B. Motion to Dismiss for Demand Futility

### 1. The Legal Standard

The Defendants have moved to dismiss the derivative claims arising from the Partnership's loan transactions with the Developer Borrowers for failure to plead demand futility.[255] A limited partner seeking to pursue a derivative claim on behalf of the limited partnership must "set forth with particularity the effort, if any, of the plaintiff to secure initiation of the action by a general partner or the reasons for not making the effort." 6 *Del. C.* § 17-1003. "Delaware courts look to pleading standards developed in the corporate context to determine whether a

---

[255] Entity Defs.' Opening Br. 10.

limited partner has alleged particularized facts satisfying section 17-1003 requirements." *Forsythe*, 2007 WL 2982247, at \*5.

The parties agree that demand futility here is governed by the *Aronson* test.[256] Under *Aronson*, "to show demand futility, [Plaintiffs] must provide particularized factual allegations that raise a reasonable doubt that (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *In re Citigroup Inc.*, 964 A.2d at 120 (second alteration in original) (citation and internal quotation marks omitted). Under the first prong:

> Disinterested means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally. Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences.

*In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 821 (Del. Ch. 2005) (internal quotations omitted). With respect to the second prong, this Court has explained that Plaintiffs must "plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason

---

[256] Entity Defs.' Opening Br. 12-13; Pls.' Ans. Br. 29. *See Aronson v. Lewis*, 473 A.2d 805 (Del. 1984). The *Aronson* test applies when "a decision of the board of directors is being challenged in the derivative suit." *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993).

to doubt that the board was adequately informed in making the decision." *Lenois v. Lawal*, 2017 WL 5289611, at *10 (Del. Ch. Nov. 7, 2017) (quoting *In re J.P. Morgan Chase*, 906 A.2d at 824)). "Certainly, if this is an 'interested' director transaction, such that the business judgment rule is inapplicable to the board majority approving the transaction, then the inquiry ceases." *Aronson*, 473 A.2d at 815. Under those circumstances, the defendant directors—or the general partner and its controllers in the case of a limited partnership—face sufficient risk from a lawsuit challenging the transaction they approved for demand to be futile. *Hughes v. Xiaoming Hu*, 2020 WL 1987029, at *11 (Del. Ch. Apr. 27, 2020).

On a motion to dismiss, the "well-pleaded factual allegations of the derivative complaint are accepted as true on such a motion." *Rales,* 634 A.2d at 931. "[T]he court [is] bound to draw all inferences from those particularized facts in favor of the plaintiff, not the defendant, when dismissal of a derivative complaint is sought." *Delaware Cty. Employees Ret. Fund v. Sanchez*, 124 A.3d 1017, 1022 (Del. 2015). "The requirement of factual particularity does not entitle a court to discredit or weigh the persuasiveness of well-pled allegations." *Louisiana Mun. Police Employees' Ret. Sys. v. Pyott*, 46 A.3d 313, 351 (Del. Ch. 2012), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013). Plaintiffs only need to "make a threshold showing, through the allegation of particularized facts, that the[] claims have some merit." *Pyott,* 46 A.3d at 351 (quoting *Rales,* 634 A.2d at 934).

The court will examine all facts pleaded to determine whether, when taken together, they cast a reasonable doubt on the general partner's disinterest or independence in considering a demand to pursue claims concerning the Developer Borrower transactions. *See Cal. Pub. Empl. Ret. Sys. v. Coulter,* 2002 WL 31888343, at *9 (Del. Ch. Dec. 18, 2002) ("If taken separately, none of the individual allegations would be adequate to raise a reasonable doubt as to Mandigo's disinterest or independence. . . . Taken together, they give this Court reason to doubt that Mandigo is disinterested and independent.").

The parties disagree as to whether the demand futility analysis should be conducted solely from the perspective of UDF III's General Partner, UMTH LD, or the individuals with ultimate decision-making authority regarding any litigation demand. Defendants argue that the Court may only consider whether the General Partner is disinterested and independent.[257] Plaintiffs argue that the Court should also look to Etter and Greenlaw, who constitute a majority of the board of UMT

---

[257] Entity Defs.' Opening Br. 13-14. The Defendants argue that demand futility must be considered only at the General Partner level and not to the humans that control it. For this proposition, the Defendants primarily rely upon *Gotham v. Hallwood Realty Partners, L.P.*, 1998 WL 32631 (Del. Ch. Nov. 10, 1998), and *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531 (Del. Ch. July 6, 2018). Because I conclude that Plaintiffs have established demand futility as to the General Partner, I need not decide this issue. *Cf. DiRienzo v. Lichtenstein*, 2013 WL 5503034, at *18 (Del. Ch. Sept. 30, 2013) (holding demand should be directed to the board of the general partner because the board was elected by the limited partners and owed fiduciary duties to the limited partners).

Services, the general partner to UMTH LD.[258]  As discussed below, Plaintiffs have alleged facts sufficient to raise a reasonable doubt that UMTH LD is disinterested and independent, and the Court needs not consider whether demand futility can be satisfied by raising reasonable doubt as to the disinterestedness and independence of Etter and Greenlaw.

### 2. Plaintiffs Have Pleaded Facts Giving Rise to a Reasonable Doubt that UMTH LD Is Disinterested and Independent.

Defendants argue that Plaintiffs' claims relating to (1) the Shahan Prairie loan,[259] (2) the violation of the loan concentration limits in the Partnership Agreement, and (3) the other loans to the Developer Borrowers and their affiliates must be dismissed for failure to plead demand futility.[260]  Any claim relating to the Shahan Prairie loan and the derivative claims alleging violation of the loan concentration limitations in the Partnership Agreement have already been dismissed.  Therefore, the remaining derivative claims subject to challenge for failure to plead demand futility are the remaining loans to the Developer Borrowers and their affiliates.

---

[258] Pls.' Ans. Br. 28-31.

[259] Plaintiffs do not appear to bring a claim challenging the Shahan Prairie loan, but rather allege the unusual circumstances surrounding the Shahan Prairie loan and its repayment as a "demonstration of the existence of the overall scheme[.]"  Pls.' Ans. Br. 62 n.32. The allegations relating to the Shahan Prairie loan do not independently state a claim because the Complaint alleges the loan has been repaid in full and does not allege damages as to that transaction.

[260] Entity Defs.' Opening Br. 15-16; Entity Defs.' Reply Br. 15.

The Complaint sufficiently alleges that UMTH LD, as the general partner of UDF III, is not disinterested and independent with respect to each of UDF III's loans to CTMGT, Buffington, and their respective affiliates. Plaintiffs have adequately alleged that UMTH LD derives a financial benefit not shared with the Limited Partners and that its actions were designed to enrich UMTH LD and its controllers at UDF III's expense with respect to its loans to the Developer Borrowers. *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 821 (Del. Ch. 2005) (defining disinterestedness and independence).

> **a.      Plaintiffs Have Pleaded Facts From Which the Court Can Reasonably Infer that UMTH LD Was Engaged in a Scheme to Pay Affiliated Funds Through Loans to the Developer Borrowers.**

As a threshold matter, the Complaint contains well-pleaded allegations that Defendants, including UMTH LD, were involved in a general scheme to funnel money from later-formed UDF Funds to pay debts of earlier UDF Funds. While some of Plaintiffs' allegations do not directly relate to injuries sustained by UDF III and its Limited Partners, they are nevertheless well-pleaded allegations that Defendants have been improperly shuttling money from one UDF entity to another through real estate developers as part of a broader scheme to permit the earlier entities to pay off loans and make distributions.

Although the Shahan Prairie loan did not cause injury to UDF III because the loan to UDF III has been repaid, the Shahan Prairie loan remains an illustrative example of how Plaintiffs allege the scheme operates. Shahan Prairie is an affiliate of CTMGT and owns 102 acres of undeveloped property in Denton, Texas.[261] UDF I loaned $2.4 million to Shahan Prairie in 2004.[262] In September 2007, UDF III made a $1.9 million loan to Shahan Prairie secured by land.[263] Shortly thereafter, in November 2007, Shahan Prairie repaid the UDF I loan in full. UDF III then increased the loan to Shahan Prairie three times, the final increase in February 2014 to approximately $4.8 million.[264] In June 2015, UDF V made an $18.1 million loan to Shahan Prairie. Immediately thereafter, Shahan Prairie repaid the UDF III loan in full.[265] The Complaint alleges that as of December 2015, the Shahan Prairie land in Denton, Texas remains undeveloped.[266]

The Plaintiffs also rely on allegations in the SEC Complaint as further evidence of a scheme sweeping in numerous United Development Fund entities.

---

[261] SAC ¶¶ 129-30.

[262] *Id.* ¶ 130.

[263] *Id.* ¶ 131.

[264] *Id.*

[265] *Id.* ¶ 132.

[266] *Id.* ¶ 134.

According to the SEC Complaint,[267] in 2011, UDF IV began making loans to developers who had also borrowed money from UDF III.[268] When UDF III did not have sufficient funds to pay partnership distributions, the developers were directed to use the funds received from UDF IV to pay down their UDF III loans.[269] In most of these cases, the developers never actually received the borrowed funds at all. Instead, the money was simply transferred from UDF IV to UDF III.[270] The Complaint alleges these transactions, which had not been disclosed to investors, resulted in at least $67 million of distributions to UDF III limited partners from UDF IV funds—or half of all distributions from January 2011 through December 2015.[271] The Complaint alleges that the General Partner did not disclose to the Limited Partners that distributions were not being funded from operations of the fund, but rather through loans from affiliated funds to the Developer Borrowers.[272]

---

[267] The SEC Complaint was filed after a four-year investigation and is attached to and incorporated by reference in the SAC.

[268] SEC Compl. ¶ 3.

[269] *Id.*

[270] *Id.*

[271] *Id.* ¶¶ 30-31.

[272] SAC ¶ 150 ("UDF III investors were led to believe that their distributions were being paid from the operation of their fund. . . . UDF III investors would have considered it important when making an investment decision that the true source of a portion of their received distributions were not actually coming from funds from operations as disclosed in UDF III's filings . . . but instead were the results of transfer from UDF IV." (quoting SEC Compl. ¶¶ 32, 34)).

Defendants argue that any alleged scheme stopped short before it harmed UDF III.[273] Defendants note that the Shahan Prairie loan was repaid in full, and that the SEC Complaint contained no allegations that UDF III loans to the Developer Borrowers were used to repay loans to earlier funds within the United Development Funds family. Therefore, according to Defendants, Plaintiffs have not alleged particularized allegations to establish a disabling conflict as to UMTH LD for purposes of excusing demand. If these were the only allegations supporting demand futility, Defendants would prevail. But they are not the only allegations, and Plaintiffs have alleged well-pleaded facts from which the Court can reasonably infer that the alleged scheme did not, in fact, stop at UDF IV.

> **b.** **Plaintiffs Have Pleaded Facts From Which the Court Can Reasonably Infer that UMTH LD Has Siphoned Funds from UDF III.**

Plaintiffs have adequately alleged that UMTH LD is not independent with respect to the Developer Borrower transactions because those transactions were undertaken for the benefit of UDF I and II at the expense of UDF III and the Limited Partners.

The Complaint contains allegations from which it is reasonable to infer that UDF III made loans to Buffington Land and its affiliates to benefit other UDF

---

[273] *See* Entity Defs.' Opening Br. 19 ("Thus, UDF III Unit Holders such as Plaintiffs would *benefit* from the conduct alleged by the SEC." (emphasis in original)).

affiliates. In November 2015, UDF III filed an involuntary bankruptcy petition against Lennar Buffington claiming a debt of $106.5 million.[274] According to Plaintiffs, the bankruptcy filings revealed that Lennar Buffington's land remained undeveloped, that Lennar Buffington had a much smaller loan on its balance sheet to UDF I, and that Lennar Buffington had no ability to repay UDF III.[275] Plaintiffs allege that UDF III's disclosures misled its investors into believing that these loans were used to fund real estate development projects.[276]

The Complaint contains well-pleaded allegations that any risk relating to the loans to Buffington Land were concealed from the Limited Partners. Plaintiffs make particularized allegations supporting a reasonable inference that the General Partner withheld from UDF III's auditors the projections by Buffington Land that showed its inability to pay its loan balance to UDF III. Instead, different projections were created to show Buffington Land being able to pay off the loan.[277] Thereafter, the Buffington Loan commitment was increased to $85 million and UDF III disclosed that full collectability was considered probable. In January 2017, UDF III forgave more than $122 million in indebtedness and UDF I forgave

---

[274] SAC ¶ 211 ("UDF III is listed in the debtor's schedules of the Lennar Buffington bankruptcy proceeding as holding a $106.5 million claim. UDF I is listed in the debtor's schedules as holding a $30.7 million claim." (emphasis omitted)).

[275] *Id.* ¶¶ 214-15.

[276] *Id.* ¶ 122.

[277] *Id.* ¶¶ 151-53.

more than $33 million in indebtedness to Buffington Land, including Lennar Buffington, for minimal consideration.[278]

The Complaint also contains allegations that Defendants have caused UDF III to act against the interests of its Limited Partners with respect to the CTMGT Loan to CTMGT and its subsidiaries. The CTMGT is a co-investment loan secured by collateral-sharing agreements which allocate the proceeds of the co-investment collateral between UDF III and UDF I.[279] Plaintiffs allege that, in July 2015, Defendants caused UDF III to enter into an agreement permitting UDF III to defer its payment preference from CTMGT so that CTGMT and its subsidiaries could prioritize payments to UDF I.[280] Such allegations are sufficient to raise a reasonable doubt that UMTH LD, as the General Partner of UDF III, was not independent regarding the UDF III's Development Borrower loans.

Plaintiffs have also alleged that UMTH LD was self-interested in the Developer Borrower transactions because UMTH LD had a financial interest in supporting UDF I and II, as well as to increase UDF III's loan balance. According to Plaintiffs, UMTH LD derived two types of benefits from by originating, extending, and increasing UDF III's loans to the Developer Borrowers. First, UMTH LD owns a 49.99% subordinated profits interest in UDF I and a 49.95%

---

[278] *See id.* ¶ 217.

[279] *Id.* ¶ 141.

[280] *Id.* ¶ 142.

subordinated profits interest in UDF II.[281]   Second, UMTH LD directly benefits

from greater loan balances at UDF III because it extracts a 0.25% annual servicing

fee from UDF III for UDF III's aggregated outstanding loan balances.[282]   These

allegations support a reasonable inference that UMTH LD had a pecuniary interest

not shared with the Limited Partners in originating, extending, and increasing loans

to the Developer Borrowers.   According to the Complaint, the Developer

Borrowers were incentivized to accept the loans from UDF III to pay their loans to

UDF I and II because their total indebtedness remained the same, and the UDF III

loans were provided at a lower rate than the prior loans to UDF I and II.[283]   Given

the number and magnitude of these loans, it is a reasonable inference that any

financial benefits UMTH LD obtained through these transactions were material.[284]

Defendants raise two arguments that UMTH LD can impartially evaluate a

demand.   First, Defendants argue that UMTH LD does not technically stand on

both sides of a transaction with UDF III because the Developer Borrowers, UDF I,

---

[281] *Id.* ¶ 340(a)-(b).

[282] *Id.* ¶ 257.   UDF III paid UMTH LD over $7.6 million in mortgage servicing fees through September 2015.  *Id.*

[283] *Id.* ¶¶ 123-24.

[284] *See id.* ¶¶ 127 ("UDF III's SEC filings indicate that as of September 30, 2015, UDF III's loan to Buffington Land had comprised 25% of its loan portfolio; its loans to CTMGT comprised another 31% of the portfolio; and its loans to CTMGT's affiliates comprised an additional 13%."); 135 (alleging that UDF III's forgiveness of $122 million indebtedness owed to UDF III by Buffington Land represented "approximately 31% of UDF III's loan portfolio as of September 30, 2015").

and UDF II serve as intermediaries.[285]  Notably, however, Defendants do not argue that the Complaint fails for demand futility regarding other challenged transactions between UDF III, UDF IV, and UDF IV subsidiaries, and merely interposing the Developer Borrowers as a mechanism to funnel funds from one related entity to another related entity does not render the allegations so "remote" and "circuitous" as to defeat the reasonable inference that these transactions were intended to benefit UMTH LD at UDF III's expense.[286]

Second, the Defendants argue that the CTMGT and Buffington loans challenged in the Complaint consist of several loans to affiliates of those entities that are not individually challenged.  However, Defendants correctly acknowledge

---

[285] Entity Defs.' Opening Br. 20 (citing *In re Coca-Cola Enters., Inc. S'holders Litig.*, 2007 WL 3122370, at *2 (Del. Ch. Oct. 17, 2007)).  *Coca-Cola* is distinguishable.  In *Coca-Cola*, the Court found that allegations of shared control were insufficient where Coca-Cola Company was alleged to control Coca-Cola Enterprises, Inc. but only named three of the latter company's thirteen directors and owned a 36% share.  By contrast, the Complaint alleges facts sufficient to reasonably infer that UMTH LD, UDF III, and UDF I are dominated by the same persons.  For example, among the many interrelationships between Defendants, Etter and Greenlaw collectively own a majority of UMT Holdings (the owner of UMTH LD) and are joint owners of UMT Services, which is argued to be at the "top of [UDF III's] control structure."  Pls.' Ans. Br. 5.  Etter and Greenlaw also own a majority of UDF I's general partner and the entirety of UDF II's general partner.  Etter and Greenlaw are also alleged to have acted in concert by forming UMT Services, UMT Holding, UMTH General, and UMTH LD.  SAC ¶¶ 31-32, 46.

[286] SAC ¶ 122 ("The proceeds of the loans that Defendants caused UDF III to make to the Developer Borrowers were not used to fund real estate development projects. Rather, UDF III's loan proceeds allowed the Developer Borrowers to pay down loans to earlier affiliates of UDF III. Upon information and belief, including the SEC Action's allegations based on its multi-year investigation, Defendants specifically directed the Developer Borrowers to use UDF III's loan proceeds in this manner."); *see also id.* ¶ 9 (alleging that the Developer Borrowers were directed to use loan proceeds to pay off earlier United Development Funds).

that the Court is not required to view any one transaction in isolation or ignore the allegations that provide relevant context.[287] In its totality, the Complaint contains allegations sufficient to raise a reasonable doubt that UMTH LD is disinterested and independent with respect to each of the loans to the Developer Borrowers.[288]

Although the Court is not determining demand futility based upon the independence or disinterestedness of the humans that ultimately control it, it is relevant to note that in responding to a demand, the General Partner would be required to consider litigation against all three individuals that ultimately control the General Partner (Etter, Greenlaw, and Wilson) and six individuals that ultimately own nearly 100% of the General Partner (Etter, Greenlaw, Wilson, Wissink, Obert, and Youngblood).

Of those six individuals, two of them—Etter and Greenlaw—constitute a majority of the board of the General Partners' general partner, and they indirectly own a majority interest in the General Partner. In that regard, the General Partner

---

[287] Entity Defs.' Reply Br. 5. "In deciding whether to consider a sequence of transactions separately or collectively, the Court reviews the circumstances surrounding the challenged transactions, as alleged by the particularized facts of the complaint, to decide whether it can be reasonably inferred that those transactions constituted a single, self-interested scheme." *In re Nat'l Auto Credit, Inc. S'holders Litig.*, 2003 WL 139768, at *9 (Del. Ch. Jan. 10, 2003).

[288] *See* SAC ¶¶ 136 (alleging that UDF III made an approximately $77 million loan to Buffington Land in 2008), 140 (alleging that UDF III originated a $25 million loan to CTMGT and its subsidiaries in 2007); *see also id.* ¶ 121 (alleging that UDF III began to make loans to CTMGT and Buffington Land shortly after UDF III's formation); 76 (alleging that UDF I made loans to CTMGT, Buffington Land, and their affiliates, and that UDF II participated in those loans).

publicly stated just three months after the filing of the original complaint in this action that it would "contest any charges that may be brought" by the SEC against "the Partnership or any individuals associated with the Partnership and its general partner."[289] Although the full details of the Wells Notice that triggered the General Partner's response were not released, the Wells Notice followed an investigation that began in April 2014 and culminated in the SEC complaint and simultaneous consent judgment that were filed in July 2018. If the General Partner were to move forward with pursing the claims asserted by the Plaintiffs in this action, it likely would have undercut the persuasive force of any Wells submission that the General Partner said would "explain the Partnership's views and its believe that no enforcement action is warranted against the Partnership or any individuals associated with the Partnership and its general partner."[290] It also could have potentially undercut the Partnership's avowed intention to "contest any charges that may be brought."[291] *C.f. In re Fitbit, Inc. S'holder Litig.*, 2018 WL 6587159, at *16-17 (Del. Ch. Dec. 14, 2018) (observing that if the corporation were to pursue derivative claims against directors it would undercut or even compromise the defense of all defendants in a parallel securities action).

---

[289] UDF III, Form 8-K (Oct. 18, 2016); *see also* SAC ¶ 148 (referencing the October 18, 2016 Form 8-K).

[290] *Id.*

[291] *Id.*

The General Partner's public rebuke of any and all potential claims against "any individuals associated with the Partnership and its general partner" further supports a pleading stage inference that the General Partner could not exercise independent and disinterested business judgment in responding to a demand to commence litigation against the three directors that control the General Partner and the six persons that own it.[292]

At bottom, evaluating the ability of a board—or in this instance, a general partner—to impartially consider a demand is a "contextual inquiry."[293]  Viewed in

[292] I find the General Partner's statements here to be distinguishable from those in *Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *6 (Del. Ch. Mar. 17, 2006), and *Tilden v. Cunningham*, 2018 WL 5307706, at *11 (Del. Ch. Oct. 26, 2018).  In both of those cases, the Court would not impute to otherwise independent and disinterested directors a statement by the company that derivative litigation was without merit.  *Singer*, 2006 WL 741939, at *6 ("It would be unreasonable for this court to conclude that a board made up of a majority of independent directors could not be asked to pursue this litigation simply *because the company* expressed a belief in a public filing that the claims in a series of related litigations were unfounded." (emphasis added)); *Tilden*, 2018 WL 5307706, at *11 ("Independent and disinterested directors are presumed to be fit to evaluate impartially the merits of a demand to pursue legal claims."); *see also Kops v. Hassell*, 2016 WL 7011569, at *2-3 (Del. Ch. Nov. 30, 2016) (concluding that a proclamation of innocence in a newspaper advertisement did not constitute *de facto* rejection of a derivative demand where there was no showing that the board or special committee considering the demand was "involved in drafting, preparing, or authorizing the advertisement").  Unlike in *Singer* and *Tilden*, the demand inquiry here is not, at least in the first instance, considered from the perspective of an otherwise disinterested and independent board, but rather the General Partner itself—which is the entity that issued the statement.  *Cf. Biondi v. Scrushy*, 820 A.2d 1148, 1166 (Del. Ch. 2003) (finding that a special committee's "publicly and prematurely issued statements exculpating one of the key company insiders whose conduct is supposed to be impartially investigated," while the investigation was underway, undermined the court's confidence in the special litigation committee's process).

[293] *Beam v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004).

isolation, any one or even several of the allegations summarized above would not be sufficient to excuse demand on the General Partner as to the Developer Borrower transactions. Viewed collectively, however, with all reasonable inferences drawn in Plaintiffs' favor, I am persuaded that Plaintiffs have alleged sufficient particularized facts that to support a reasonable inference that the General Partner was involved in a broad scheme that utilized UDF III loans to two favored real estate development firms and their affiliates to maintain partnership distributions at affiliated funds. The allegations are sufficient to excuse demand as to the derivative claims concerning the specific Borrower Loan transactions alleged in the Complaint. *See Sanchez*, 124 A.3d at 1019 ("[I]t is important that the trial court consider all particularized facts pled by the plaintiffs about the relationships between the director and the interested party in their totality and not in isolation from each other, and draw all reasonable inferences from the totality of those facts in favor of the plaintiffs.").

## III.   CONCLUSION

For the foregoing reasons, pursuant to Court of Chancery Rule 12(b)(6), the motion to dismiss is GRANTED in part and DENIED in part and as to as to Counts I, II, V, and VI, DENIED as to Count IV, and GRANTED as to Counts III and VII. The motion to dismiss pursuant to Court of Chancery Rule 23.1 is DENIED.

**IT IS SO ORDERED**.

90

# APPENDIX



Asset Manager or Advisor

Ownership Interest

Currently, Entities with which UDF III Has Outstanding Loans, Guaranties and/or Participation Interest

The Plaintiffs and Nominal Defendant

**Red Typeface**   Fiduciary Duty Defendants

(1)   United Development Funding, Inc. ("UDF I, Inc.") serves as general partner for UDF I and owns a 0.02% general partnership interest in UDF I. Defendants Etter and Greenlaw each own 33.75% of UDF I, Inc. Land Development owns a 49.99% subordinated profits interest in UDF I.

(2)   United Development Funding II, Inc. ("UDF II, Inc.") serves as general partner for UDF II and owns a 0.1% general partnership interest in UDF II. Defendants Etter and Greenlaw each own 50% of UDF II, Inc. Land Development owns a 49.95% subordinated profits interest in UDF II.